**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

MICHAEL YELAPI; PATRICIA SANCHEZ; JAIME MARIONA; JULIA MICHALKA; CARLOS APONTE; and DISABILITY RIGHTS FLORIDA,

*Plaintiffs*,

v.

RONALD DESANTIS, in his official capacity as Governor of Florida; THE EXECUTIVE OFFICE OF THE GOVERNOR; FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, the public body corporate acting for and behalf of Florida State University; and JOHN THRASHER, in his official capacity as President of Florida State University,

*Defendants*.

Case No. 4:20-cv-00351-AW-MAF

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**ARNOLD & PORTER KAYE SCHOLER LLP**

Ian S. Hoffman
(*pro hac vice*)
Zachary A. Sweebe
(*pro hac vice*)
Julia H. Wingfield
(*pro hac vice*)

**DISABILITY RIGHTS FLORIDA**

Ann Marie Cintron-Siegel
(FL Bar No. 0166431)
Lauren Brittany Eversole
(FL Bar No. 120245)

**NATIONAL ASSOCIATION OF THE DEAF**

Leah Wiederhorn
(*pro hac vice*)
Marc Charmatz

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ....................................................................1

I. The Parties ....................................................................5

II. Deaf Users of American Sign Language ....................................................................8

III. The Governor's Press Briefings ....................................................................10

IV. Communication Abilities of Plaintiff Carlos Aponte ....................................................................13

STANDARD OF REVIEW ....................................................................14

LEGAL FRAMEWORK ....................................................................15

ARGUMENT ....................................................................18

I. Defendants' Refusal to Provide ASL Interpreters at the Governor's Press Briefings Discriminates Against Deaf People Who Require ASL to Effectively Communicate. ....................................................................18

A. The Individual Plaintiffs Are "Qualified Individuals with Disabilities" ....................................................................19

B. Defendants Are Covered Entities Under the ADA and the RA ....................................................................20

1. Defendants Are "Public Entities" for ADA Purposes ....................................................................20

2. Defendants Receive "Federal Financial Assistance" For RA Purposes ....................................................................22

C. Defendants' Gubernatorial Press Briefings and Videos Are "Services, Programs, or Activities" of Entities Subject to the ADA and the RA ....................................................................24

D. Defendants' Failure to Provide ASL Interpreters at the Governor's Press Briefings Constitutes Discrimination as a Matter of Law ....................................................................27

1. Defendants Are Required to Provide Deaf Floridians with Effective Communications through an Auxiliary Aid ....................................................................27

1. Defendants Failed to Give Primary Consideration to Plaintiffs Aponte's and DRF's Requests for ASL Interpretation ....................................................................29

2. Closed Captioning Is Not Equally Effective to ASL Interpretation ....................................................................31

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

II. Defendants Have Not Demonstrated that Providing ASL Interpreters Constitutes an Undue Burden or Fundamental Alteration as a Matter of Law ....................37

A. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute a Fundamental Alteration ....................38

B. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute an Undue Burden ....................39

CONCLUSION ....................42

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Choate*,
469 U.S. 287 (1985)....28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....15

*Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*,
405 F.3d 954 (11th Cir. 2005)....21

*Badillo v. Thorpe*,
158 F. App'x 208 (11th Cir. 2005)....16, 22, 24

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
531 U.S. 356 (2001)....28

*Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*,
765 F.3d 1277 (11th Cir. 2014)....39

*Bircoll v. Miami-Dade Cnty.*,
480 F.3d 1072 (11th Cir. 2007)....20, 37

*Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*,
133 F.3d 816 (11th Cir. 1998)....24

*Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*,
980 F. Supp. 2d 588 (S.D.N.Y. 2013)....26

*Cash v. Smith*,
231 F.3d 1301 (11th Cir. 2000)....16, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).... 14-15

*Fisher v. Oklahoma Health Care Auth.*,
335 F.3d 1175 (10th Cir. 2003)....41

*Fry v. Napoleon Cmty. Sch.*,
580 U.S. 154 (2017)....21

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*Haves v. City of Miami*,
52 F.3d 918 (11th Cir. 1995) ....................15

*Liese v. Indian River Cnty. Hosp. Dist.*,
701 F.3d 334 (11th Cir. 2012) ....................20

*M.R. v. Dreyfus*,
697 F.3d 706 (9th Cir. 2012) ....................41

*Martinez v. Cuomo*,
459 F. Supp. 3d 517 (S.D.N.Y. 2020) ....................26

*McGann v. Cinemark USA, Inc.*,
873 F.3d 218 (3d Cir. 2017) ....................39

*McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'rs*,
650 F. App'x 703 (11th Cir. 2016) ....................23

*Nat'l Ass'n of the Deaf v. Fla.*,
980 F.3d 763 (11th Cir. 2020) ....................28, 37

*Nat'l Ass'n of the Deaf v. Trump*,
486 F. Supp. 3d 45 (D.D.C. 2020) ....................26

*Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*,
402 F.3d 374 (3d Cir. 2005) ....................41

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ....................41

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
938 F.3d 1259 (11th Cir. 2019) .................... 38-39

*Schwarz v. City of Treasure Island*,
544 F.3d 1201 (11th Cir. 2008) ....................38

*Shotz v. Cates*,
256 F.3d 1077 (11th Cir. 2001) ....................37

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*Silva v. Baptist Health South Florida, Inc.*,
856 F. 3d 824 (11th Cir. 2015) ....................27

*Tennessee v. Lane*,
541 U.S. 509 (2004) ....................37

*Updike v. Multnomah Cnty.*,
870 F.3d 939 (9th Cir. 2017) ....................40

*Varnedoe v. Postmaster Gen.*,
2022 WL 35614 (11th Cir. Jan. 4, 2022) .................... 14-15

**Statutes**

28 U.S.C. § 2201 .................... 42-43

28 U.S.C. § 2202 ....................43

29 U.S.C. § 705 ....................16, 19

29 U.S.C. § 794 .................... 16, 19-24

42 U.S.C. § 12102 ....................19

42 U.S.C. § 12103 ....................30

42 U.S.C. § 12131 .................... 16, 19-21

42 U.S.C. § 12132 .................... 16, 19-20

42 U.S.C. § 15001 ....................5, 35

Fla. Stat. § 14.201 ....................5, 20

Fla. Stat. § 14.2016 ....................6, 23

Fla. Stat. § 216.011 ....................23

Fla. Stat. § 1000.21 ....................7, 21

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

**Rules of Federal Procedure**

Fed. R. Civ. P. 56 .......... 14-15

**Regulations**

28 C.F.R. part 35 .......... 24, 30

28 C.F.R. § 35.104 .......... 30

28 C.F.R. § 35.108 .......... 19

28 C.F.R. § 35.130 .......... 24, 27-28

28 C.F.R. § 35.150 .......... 17, 37

28 C.F.R. § 35.160 .......... 17, 27-29, 36-37

28 C.F.R. § 35.164 .......... 17, 37

28 C.F.R. § 41.51 .......... 27

28 C.F.R. § 42.503 .......... 28-29

**Other Authorities**

DOJ Title II Technical Assistance Manual, II-7.1100 .......... 29

DOJ ADA Requirements: Effective Communication .......... 36

**PRELIMINARY STATEMENT**

For over two years, Plaintiffs Michael Yelapi, Patricia Sanchez, Jaime Mariona, Julia Michalka, Carlos Aponte (together, the "Individual Plaintiffs") and Disability Rights Florida ("DRF") have pursued accessible government communication from Governor Ronald DeSantis (the "Governor") regarding COVID-19 and hurricanes, for themselves, and for the hundreds of thousands of other similarly situated deaf Floridians. Yet, since August 2020, the Governor has not provided American Sign Language ("ASL") interpreters at his COVID-19 press briefings. And the Governor has only sporadically provided interpreters at hurricane press briefings, including the recent press briefings about Hurricane Ian. The Florida Chanel ("TFC"), a public affairs programming service provided by Florida State University ("FSU"), does not provide interpreters for any of the Governor's press briefings it airs, and TFC makes no independent effort to ensure that interpreters are provided; the few TFC videos with interpreters exist only because *someone else* requested, paid for, and positioned the interpreter within view of TFC's camera.

ASL is a visual language totally different from English, with its own vocabulary, syntax, and grammar. The differences between the two languages often lead to misunderstandings for deaf individuals who rely on ASL. In an effort to avoid such misunderstandings and to ensure accessibility for deaf Florida

residents, before filing this lawsuit, Plaintiffs requested ASL interpretation as an auxiliary aid so that deaf Floridians who use ASL would have the opportunity to benefit equally from press briefings by their Governor. DRF constituents' and the Individual Plaintiffs' primary language is ASL, and the undisputed facts of this case establish that they would all benefit if the Governor's press briefings were interpreted into ASL. Indeed, without ASL interpretation, many deaf Floridians cannot understand of the Governor's press briefings. For Mr. Aponte, for example, interpretation into ASL is the only way he can understand written or oral English. As the undisputed facts establish, the Governor's press briefings are completely inaccessible to Mr. Aponte unless an ASL interpreter is provided—and there are many other deaf Floridians like him.

Yet, Defendants continue to refuse Plaintiffs' requests for ASL interpreters. This refusal is unlawful and harmful. Plaintiffs struggle with feelings of isolation and fear, wondering what they are missing when no ASL interpreter is present during a press briefing:

> "Where's the sign language interpreter? I don't see any. The caption, there was nothing. **So that upset me. What's he talking about?** I need to know the actual information, how we can survive during this pandemic."
> Sanchez Dep. 47:13-17 (via interpreter) (emphasis added)
>
> "You know, the governor was on television more than anyone else and they didn't have interpreters. **And it was their job to keep us safe**, prevent us from getting sick or spreading the virus."
> Mariona Dep. 115:5-8 (via interpreter) (emphasis added)

> "**[W]hat if other dangerous situations are happening?** If there's no interpreter provided when these briefings are happening, then … I can look at the picture on the news screen, but **I wouldn't know what's happening because I'm deaf**."
> Aponte Dep. 134:12-19 (via interpreter) (emphasis added)

Defendants have ignored and effectively excluded from the public square Plaintiffs and the hundreds of thousands of similarly situated deaf Floridians who use ASL—because the Governor and FSU refuse to provide ASL interpretation for press briefings on COVID-19 or hurricanes, despite their independent obligations to do so. Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act (the "RA") prohibit discrimination—including through the denial of equally effective access to public benefits, programs, or services. By refusing to provide the auxiliary aid of ASL interpretation, Defendants deny deaf people who use ASL an opportunity to effectively access gubernatorial press briefings on COVID-19 and hurricanes in violation of both the ADA and the RA. Further, Defendants cannot show that the relief Plaintiffs seek poses an undue burden or would result in a fundamental alteration of the press briefings. And while Defendants argue that closed-captioning is an equally effective alternative for all deaf individuals, discovery has simply not borne out their claims.

The Individual Plaintiffs and DRF now respectfully submit this memorandum of law in support of their motion for summary judgment against the

Governor, the Executive Office of the Governor (the "EOG," together with the Governor, the "EOG Defendants"), FSU, and John Thrasher, in his official capacity as President of Florida State University (together with FSU, the "FSU Defendants").

Plaintiffs Yelapi, Sanchez, Mariona, and Michalka move for partial summary judgment and seek a determination that the Individual Plaintiffs are qualified individuals with disabilities under the ADA and the RA; that Defendants are covered entities; and that press briefings qualify as a protected service, activity, or program. Plaintiffs Mr. Aponte and DRF join the motion on these grounds and also seek judgment as a matter of law that Defendants are in violation of the ADA and the RA as their claims present clear and undisputable facts that significantly limit the scope of any fact-intensive analysis. Nothing less than ASL interpretation is effective means to communicate to him and to the many deaf Floridians like him who speak only ASL. Moreover, as all Plaintiffs seek identical relief, a favorable ruling will resolve the claims of the remaining Plaintiffs, thus obviating the need to engage in any fact-intensive analysis regarding their claims.

For these reasons, as well as those articulated below, the Court should hold that Plaintiffs are entitled to the protections of the ADA and the RA and that Defendants have violated both as to Mr. Aponte and DRF, and require that

Defendants provide ASL interpreters for all gubernatorial press briefings on COVID-19 and hurricanes.

## FACTS

### I. The Parties

1) The Individual Plaintiffs are each deaf residents of Florida. *See e.g.,* Ex. 1, Aponte Dep. 24:3-7; 22:8; Ex. 2, Mariona Dep. 48:7-13; 10:13; Ex. 3, Michalka Dep. 50:14-19; Ex. 4, Sanchez Dep. 19:14-23; 9:19; Ex. 5, Yelapi Dep. 143:21-144:1; 8:7. Plaintiff DRF is a Protection and Advocacy System ("P&A") with a federal statutory mandate to advocate for disabled Floridians, including deaf Floridians. Ex. 11, Sleasman Dep. 21:6-17; 42 U.S.C. § 15001, Pub. L. No. 106-402. DRF has directly represented approximately 1,600 deaf clients, in addition to representing the approximately 820,000 deaf individuals who live in the state of Florida. Ex. 11, Sleasman Dep. 15:11-19; 83:11-15. Plaintiffs have requested ASL interpreters for the Governor's press briefings. *See* Am. Compl., ECF No. 35.

2) The EOG is an agency operating within the executive branch of the state of Florida. *See* Ex. 9, Kelly Dep. 67:15-23; Ex. 8, Gambineri Dep. 23:18-23:23; Fenske Dep. 23:17-24:20; Ex. 10, Mahon Dep. 21:19-25; *see also* Fla. Stat. § 14.201. The EOG at all times relevant to this action has not

disputed that the EOG is a "public entity" within the meaning of Title II of the ADA. *See* Am. Compl., ECF No. 35 ¶ 226; EOG Answer to Am. Compl., ECF No. 71 ¶ 226 ("Admitted").

3) The Division of Emergency Management ("DEM") is a division established within the EOG.[1] Ex. 24, Fenske Dep. Ex. 2; *see also* Ex. 10, Mahon Dep. 16:9-18; Ex. 22, Def. EOG's Resp. to Pl.'s Written Questions at 1-2; Fla. Stat. § 14.2016(1). DEM appears within the EOG organizational chart, and reports to the EOG's Director of Policy & Budget. Ex. 24, Fenske Dep. Ex. 2. DEM's director is appointed and serves at the pleasure of the Governor. Fla. Stat. § 14.2016(1). The EOG coordinates with DEM to hold the Governor's press briefings related to COVID-19 and hurricanes. Ex. 7, Fenske Dep. at 59:4-60:17.

4) FSU is one of the largest and oldest of the twelve institutions of higher learning in the State University System of Florida. *See, e.g.*, Florida State University, The Florida State University Faculty Handbook 2021-2022, at 2 (June 2022) available at https://facultyhandbook.fsu.edu/sites/g/files/upcbnu471/files/FacHandbook2

[1] The Fiscal Year 2021-22 budget for DEM is $1,663,647,998, of which $1,426,522,931 is federal funding. Def. Ronald DeSantis and EOG's Resp. to Pl.'s Written Questions at 2. Almost $1.4 billion of this funding is provided by the Federal Emergency Management Act ("FEMA") for emergency response, recovery, and mitigation in the State of Florida. *Id.*

022-Jun-23.pdf; Fla. Stat. § 1000.21(6)(b). FSU's website acknowledges that "[a]s a public entity, FSU is required by Title II of the ADA to make all of its activities, programs and services equally available to persons with disabilities." FSU Office of Human Resources, Americans with Disabilities Act (ADA), available at https://hr.fsu.edu/sections/equity-diversity-inclusion/americans-disabilities-act-ada. FSU directly receives federal financial assistance. Ex. 27, Def. FSU's Resp. to Pl.'s Interrog. No. 18. FSU is the project recipient and holder of the contract to produce and operate the public affairs programming service known as TFC. Ex. 6, Brown Dep. 48:21-49:3; Ex. 26, FSU Florida Channel Year Round.

5) TFC is a department of WFSU, which is, itself, a part of FSU.[2] Ex. 23, FSU Def.'s Resp. to Pl.'s Written Questions at 2. The General Manager for WFSU oversees TFC and the Executive Director of TFC is a direct report to the General Manager of WFSU. *Id.*; Ex. 12, Switzer Dep. II 14:11-17:19; 14:11-17:19; Ex. 6, Brown Dep. 49:16-24. WFSU shares its satellite and support staff with TFC and the individuals responsible for TFC are

---

[2] FSU's Board of Trustees governs WFSU, which is FSU's public broadcasting station. Ex. 27, Def.'s Resp. to Pl.'s Written Questions to Def. FSU at 1; Ex. 6, Brown Dep. 48:13-14. The 24/7 program stream that TFC produces is broadcast by WFSU as a digital subchannel (Channel 11.2). Ex. 27, Def.'s Resp. to Pl.'s Written Questions to Def. FSU at 2. FSU also provides financial support to WFSU. *Id.* at 1.

employed on a term limited basis by FSU, with TFC staff paid with FSU checks. Ex. 12, Switzer Dep. I 95:22-96:3; Switzer Dep. II 14:11-17:19, Ex. 6, Brown Dep. 50:23-51:5; Ex. 23, FSU Def.'s Resp. to Pl.'s Written Questions at 2. TFC personnel have described the relationship between WFSU and TFC as "operat[ing] within the same family." Ex. 6, Brown Dep. 48:21-49:3.

**II. Deaf Users of American Sign Language**

6) Deaf people are a linguistic and cultural minority who remain communicatively disadvantaged, as many deaf people do not attain competence in either written or spoken English. Ex. 13, Shepard-Kegl Rep. at 11, 24, 45. ASL is the primary and preferred method of communication for many deaf people, including the Individual Plaintiffs. *Id.* at 45. The function of an ASL interpreter is merely to be present and interpret the words of the speaker such that a deaf person could understand the message being conveyed. *See generally id.,* Appendix D at 54. ASL is visual and gestural, yet contrary to popular belief, ASL is not English with hand gestures. *Id.* at 13. Nor is ASL a manual "version" of any spoken language; it is an entirely independent language informed by the unique linguistic experiences, and needs, of deaf Americans. *Id.* Both the grammar and vocabulary used in ASL are distinct from English, and ASL involves

expressive movements and expressions not found in written communications. *Id.* at 14-15. Indeed, the grammar and syntax of ASL has more in common with Russian than it does with English. *Id.* at 13-17.

7) ASL and English differ in many ways, including how they mark subjects and objects (English uses word order; ASL uses agreement on verbs), and in how they ask questions (in English the question word is at the beginning; in ASL the question word is at the end). *Id.* at 14. The English language typically adds suffixes to words to indicate person, number, and tense, while ASL is a "polysynthetic language" that can express the same idea in a single word where it would take an entire English sentence to convey. *Id.* at 14-15. These differences can lead a deaf, ASL user to misunderstand what seems clear and obvious to a hearing, English speaker: for example, a passive sentence like *John was hit by Mary* is instead taken to mean *John hit Mary* and the sentence *John upset Mary* is understood as *John was upset and Mary had something to do with that. Id.* at 17; 24-25. These innate differences between ASL and English compound the issue of English access for deaf users of ASL. *Id*. at 25.

8) For a hearing person, written English text and spoken English dialogue may be interchangeable, but for a deaf person who uses ASL, written English text lacks the same quality of "message equivalence." *Id.* at 13. Many deaf

people, therefore, do not attain competence in either written or spoken English. *Id*. at 24. Fluency in English is "often more challenging for Deaf individuals because of lack of access to the spoken English around them." *Id.* at 22. Indeed, the "hard reality" is that fifty percent of the deaf population in the United States reads English at a fourth-grade level or below. *Id.* at 24. For many deaf people, ASL is the only means of providing and receiving effective and reliable communication. *Id*. at 45.

## III. The Governor's Press Briefings

9) The Governor first held a press briefing on COVID-19 on February 27, 2020. Ex. 19, 20, 21, EOG's Resp. to Pl.'s Interrog. No. 5. Since February 2020, the Governor has routinely held press briefings on COVID-19. *Id.* Most of these press briefings have not included an ASL interpreter. *Id*. The EOG has failed to provide any ASL interpreters at gubernatorial press briefings on COVID-19 since August 2020. *Id*. During the course of the litigation of this case, on May 9, 2022, the EOG also enacted a policy that internally required the EOG to provide interpreters during declared states of emergency. Ex. 25, Kelly Dep. Ex. 2 at 1. Under the stated terms of this policy, the EOG will *request* ASL interpreters only for "Covered Gubernatorial Press Briefing[s]," which is defined to include only "Gubernatorial Press Briefing[s] intended primarily to disseminate health or

safety-related information to the public regarding a declared or imminent state of emergency pursuant to section 252.36, Florida Statues."[3] *Id.*

10) This year, the EOG also solicited and executed multiple contracts with interpreting agency vendors. Ex. 7, Fenske 96:7-21; Ex. 25, Kelly Dep. Ex 2 at 2, n. 1. The EOG could not identify the fees or costs associated with the use of the ASL interpreter agencies in its contracts. Ex. 10, Mahon Dep. 88:11-20; Ex. 9, Kelly 45:16-19. Despite these contracts and its internal policy, the EOG did not provide ASL interpreters for over a third of the Hurricane Ian press briefings held between September 25, 2022 and October 17, 2022. Ex. 21, EOG's Fourth Supp. Resp. to Pl.'s Interrog. No. 5.

11) The EOG films the Governor's press briefings with its own camera, and posts those briefings on the Governor's official social media pages, including Facebook and Rumble. Ex. 7, Fenske Dep. 36:3-17; 37:1-8. These social media platforms include automated closed-captioning. Ex. 7, Fenske Dep. 69:1-3; 70:14-25. The EOG does not itself provide closed

[3] The EOG admitted it is not unduly burdensome to provide ASL interpreters for the Governor's press briefings during a declared state of emergency. Ex. 10, Mahon Dep. 87:50-9. The EOG identified only the cost of an ASL interpreter as the additional burden at a press conference where there is not a declared state of emergency. Ex. 10, Mahon 91:16-19. The EOG likewise could not identify any example of how the Governor's press briefings would fundamentally alter the nature of the press briefing. Ex. 10, Mahon Dep. 89:4-91:5.

captioning for the Governor's press conferences beyond this automated captioning. *Id.*

12) TFC also broadcasts the Governor's press briefings. Ex. 12, Switzer Dep. I 19:19-20:2; Ex. 6, Brown Dep. 30:6-20; Ex. 7, Fenske Dep. 70:10-11. In addition to broadcasting, TFC includes an archive of the Governor's briefings in a video library on its website. Ex. 12, Switzer 25:8-12; 26:4-17. TFC and FSU have never provided real-time ASL interpretation for the Governor's live press briefings. Ex. 12, Switzer Dep. at 216:10-15. It is technically feasible for TFC to add to the Governor's press briefings an on-screen picture-in-picture image of an ASL interpreter. Ex. 14, Brooks Rep. at 2.[4] TFC's Chief Engineer, Terry Longordo, did not dispute the conclusions, and he agreed that Mr. Brooks method could work. However, for all of the Governor's press conferences related to COVID-19 and hurricanes where an interpreter was not provided, TFC's video library does not include an ASL interpreter. *See generally* The Florida Channel, *Storm Coverage Archives*, https://thefloridachannel.org/programs/storm-coverage/ (last accessed Oct. 17, 2022). Instead, TFC provides automated and human

[4] TFC's Chief Engineer, Terry Longordo, did not dispute the conclusions, and he agreed that Mr. Brooks method could work. Ex. 15, Longordo Dep. 63:2-22.

closed-captioning at the Governor's press briefings, depending on the circumstances. Ex. 28, Coleman Dep. at 33:4-22.

## IV. Communication Abilities of Plaintiff Carlos Aponte

13) Carlos Aponte was born deaf and experiences hearing loss in the profound to severe category today. Ex. 1, Aponte Dep. Trans. 133:7-133:21; Ex. 17, Aponte CSA at 2. His preferred and primary means of communication is ASL. Ex. 17, Aponte CSA at 2. Mr. Aponte is extremely limited in his ability to read and communicate in English. Ex. 1, Aponte Dep. 27:20-28:12; 36:1-23; 110:3-110:6; 113:7; 113:15; 133:21; Ex. 17, Aponte CSA at 2. Mr. Aponte cannot read and understand documents written in English and must rely upon ASL users and interpreters to read and interpret these documents for him. Ex. 1, Aponte Dep.113:2-113:18. He relies on ASL interpreters at medical appointments as he cannot communicate via written notes of any capacity, and when he watches television, he relies exclusively on the images on screen. Ex. 1, Aponte Dep. 34:15-20; 113:2-113:18; 121:5-121:9. When Mr. Aponte looks at a newspaper, or at any written form of news, he does not understand the written English at all. Ex. 1, Aponte Dep. 37:19-25. He relies on the pictures to "deduce what is going on." *Id.* He cannot understand closed captioning whatsoever. Ex. 1, Aponte Dep. Trans. 33:23-34:2; 110:5-6.

14) Mr. Aponte's communication abilities were assessed through a Communication Skills Assessment ("CSA"), which is a communication assessment designed "assess an individual's relative strengths and weakness across a continuum of communication modalities." Ex. 16, Charlene Crump Rep. at 3. It is not designed to compare modalities within the individual, or to any group norm. *Id*. The CSA, as completed by Mr. Aponte, consists of two reading portions: (1) Reading A, where the assessor asked Mr. Aponte to read sixteen English words and either sign or draw them back; and (2) Reading B, where the assessor asked Mr. Aponte to read nine English sentences and match each sentence to a sentence with the same meaning from four choices. *Id.* at 6; Ex. 18, Aponte CSA Recording Form. In Reading A, he correctly identified only two of the sixteen words (apple and door), and in Reading B, he only correctly matched the sentence to the choice with the same meaning one of the nine times. Ex. 18, Aponte CSA Recording Form.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *see also Varnedoe v. Postmaster Gen.*, 2022 WL 35614 at *2 (11th

Cir. Jan. 4, 2022). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Varnedoe*, 2022 WL 35614 at *2. A fact is "material" when it might affect the outcome. *Id.*

At the summary judgment stage, the Court's role is not to weigh the evidence, but rather to determine whether there are genuine issues for trial. *Id.* at 249. In doing so, the Court must "view all evidence and make all reasonable inferences in favor of" the nonmoving party. *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

To create a genuine issue of fact, the opposing party must cite "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A) (requiring that litigants cite to "particular parts of materials in the record" in support of their factual assertions).

## **LEGAL FRAMEWORK**

The broad mandates of the ADA and the RA require all public entities to ensure that their operations are equally accessible to all persons with disabilities. Specifically, Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Similarly,

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"With the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005); *see also Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."); Order on Motion to Dismiss, ECF No. 65 at 6 n.2 (Mar. 12, 2021) ("The ADA and the RA have the same substantive requirements.").

The analysis under both statutes is essentially the same. *First*, the ADA and RA protect "qualified individuals with disabilities" from discrimination. 42 U.S.C. § 12131(2); *see also* 29 U.S.C. § 705(20)(B). *Second*, the prohibition against discrimination of qualified individuals applies to any "public entity" (under the ADA) or any entity receiving "federal financial assistance" (under the RA). 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a). *Third*, these covered entities may not discriminate in "the services, programs or activities" they provide. *See* 28 C.F.R. § 35.160. *Fourth*, for individuals with communication disabilities, covered entities

must ensure that their communications with these individuals are "*as effective* as communications with others," and must "furnish appropriate auxiliary aids and services where necessary, giving *primary consideration* is given to the requests of people with disabilities. 28 C.F.R. §§ 35.160(a)(1), (b)(1), and (b)(2). *Finally*, the requested auxiliary aid must be provided unless the covered entities show that doing so would constitute an undue burden or fundamental alteration. 28 C.F.R. § 35.150(a)(3); 28 C.F.R. § 35.164.

Plaintiffs Yelapi, Sanchez, Mariona, Michalka, Aponte, and the deaf individuals DRF represents are entitled to partial summary judgment on the grounds that, as deaf people, they are qualified individuals under the ADA and RA; that Defendants are covered entities; and that press briefings qualify as a protected service, activity, or program. Plaintiffs Aponte and DRF are further entitled to summary judgement findings that Defendants violated the ADA and RA by failing to provide equally effective communications through the auxiliary aid of ASL interpreters and by failing to demonstrate that doing so would constitute an undue burden or fundamental alteration.

## ARGUMENT

### I. Defendants' Refusal to Provide ASL Interpreters at the Governor's Press Briefings Discriminates Against Deaf People Who Require ASL to Effectively Communicate.

Defendants' failure to provide ASL interpreters at the Governor's press briefings unlawfully discriminates against deaf individuals who require ASL to effectively communicate because Defendants offer no other *equally effective* accommodation to these deaf Floridians. Both the ADA and the RA mandate that qualified individuals with disabilities be provided equally effective access to such briefings, and that their requested auxiliary aid be given *primary consideration*. For deaf individuals, this means that the Governor's communications during his press briefings must be as effective for them as it is for hearing individuals. For deaf individuals who require ASL to effectively communicate in this context, this means Defendants must provide an ASL interpreter. There is no material dispute of fact that closed captioning, the alternative auxiliary aid provided by Defendants, is not equally effective to ASL interpretation. Closed captioning does not ensure the communications Defendants have with the hearing public are as effective as the communications it has with deaf individuals. Accordingly, Defendants' failure to provide Plaintiffs' requested auxiliary aid of ASL interpretation constitutes unlawful discrimination. Further, Defendants failed to meet their burden to prove

that providing ASL interpreters is an undue burden or fundamental alternation. As there are no facts in the record to support this argument, it is undisputed.

### A. The Individual Plaintiffs Are "Qualified Individuals with Disabilities"

The ADA and the RA protect qualified individuals with disabilities from discrimination. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). The ADA and the RA define "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(9)(B). A "qualified individual with a disability" is a person "who, with or without reasonable modification to rules, policies or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 29 U.S.C. § 705(20)(B).

Here, each of the Individual Plaintiffs is indisputably deaf. *See* Facts at ¶ 1, *supra*; *see also* FSU Mot. to Dismiss, ECF No. 49 at 2 (Nov. 9, 2020) ("Plaintiffs, Yelapi, Sanchez, Mariona, Michalka, and Aponte are deaf Floridians"). Defendants have never challenged Plaintiffs' deafness, nor do Defendants deny that deafness qualifies as a "physical impairment . . . that substantially limits" the major life activities of hearing and speaking. 42 U.S.C. § 12102(1)(A); *see* 42 U.S.C § 12102 (2)(A); 28 C.F.R. § 35.108(c)(1)(i) (defining "major life activities" to include hearing and speaking); *see also, e.g.*, *Liese v. Indian River Cnty. Hosp.*

*Dist.*, 701 F.3d 334, 342 (11th Cir. 2012); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007). Additionally, deaf Floridians generally—represented here by DRF— indisputably are qualified individuals with disabilities for the very same reason.

The Individual Plaintiffs and the deaf Floridians that DRF represents thus constitute qualified individuals with disabilities for ADA and RA purposes.

**B. Defendants Are Covered Entities Under the ADA and the RA**

Title II of the ADA prohibits discrimination by any "public entity." 42 U.S.C. § 12132. Section 504 of the RA prohibits "discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Defendants meet the definition of "public entity" for ADA purposes, and they also "receiv[e] Federal financial assistance" for RA purposes. As such, Defendants are subject to the anti-discrimination prohibitions of the ADA as well as the RA.

***1. Defendants Are "Public Entities" for ADA Purposes***

Under the ADA, a public entity includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

The EOG is an agency operating within the executive branch of the state of Florida. *See* Facts at ¶ 2, *supra*; *see also* Fla. Stat. § 14.201. As a state government agency, the EOG is covered by the plain language of the ADA. 42

U.S.C. § 12131(1). Indeed, the EOG Defendants readily admit that "the Executive Office of the Governor at all times relevant to this action, and currently is a 'public entity' within the meaning of Title II of the ADA." *See* Am. Compl., ECF No. 35 ¶ 226; EOG Answer to Am. Compl., ECF No. 71 ¶ 226 ("Admitted").

FSU is a public university that describes itself as "one of the largest and oldest of the 12 institutions of higher learning in the State University System of Florida." *See, e.g.,* Florida State University, *The Florida State University Faculty Handbook 2021-2022,* at 2 (June 2022) available at https://facultyhandbook.fsu.edu/sites/g/files/upcbnu471/files/FacHandbook2022-Jun-23.pdf; Fla. Stat. § 1000.21(6)(b). FSU holds of the contract to produce and operate the public affairs programming service called "The Florida Channel." Facts at ¶ 4, *supra*. TFC is not an independent legal entity.

As a public state university, FSU is also a "public entity" for ADA purposes. 42 U.S.C. § 12131(1); *see Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017) ("Of particular relevance to this case are two antidiscrimination laws—Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794—which cover both adults and children with disabilities, in both public schools and other settings."); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.,* 405 F.3d 954, 958-59 (11th Cir. 2005) (finding Title II appropriately applies to public education, including public universities).

Indeed, FSU recognizes on its website that "[a]s a public entity, FSU is required by Title II of the ADA to make all of its activities, programs and services equally available to persons with disabilities." FSU Office of Human Resources, *Americans with Disabilities Act (ADA)*, available at https://hr.fsu.edu/sections/equity-diversity-inclusion/americans-disabilities-act-ada.

As the EOG and FSU are "public entities" for ADA purposes, they are prohibited from discriminating against individuals with disabilities in the programs and services they provide.

#### ***2. Defendants Receive "Federal Financial Assistance" For RA Purposes***

The RA prohibits entities from discriminating in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, any entity—private or public—that receives federal financial assistance is bound by the same substantive requirements as Title II of the ADA. *See Badillo*, 158 F. App'x at 214; *Cash*, 231 F.3d at 1305 n.2.

The EOG receives federal funding to assist in running its operations. Facts at ¶ 3, *supra*. Specifically, the Federal Emergency Management Agency ("FEMA") provides funding to the EOG's Department of Emergency Management ("DEM") for emergency response, recovery, and mitigation in the State of Florida. *Id.* DEM is a division "established *within* the Executive Office of the Governor," and its director "shall be appointed by and serve at the pleasure of the Governor

and shall be the head of the division for all purposes." *Id.*; Fla. Stat. § 14.2016(1) (emphasis added). DEM appears within the EOG organizational chart, and reports to the EOG's Director of Policy & Budget. Facts at ¶ 3, *supra*.[5] This receipt of federal financial assistance prohibits the EOG Defendants from discriminating in their provision of its programs and activities. 29 U.S.C. § 794(a).

FSU also receives federal financial assistance and is therefore required to follow the mandates of the RA. Facts at ¶ 5, *supra*. FSU—the entity that employs, pays, and holds the contract for TFC—directly receives federal financial assistance. Facts at ¶ 4, *supra.* Likewise, FSU's broadcast station, WFSU—which receives federal financial assistance—oversees, and even shares its satellite and its support staff with, TFC. Facts at ¶ 5, *supra.* TFC personnel have described the relationship between WFSU and TFC "operat[ing] within the same family." *Id.* FSU and WFSU's receipt of federal funds are sufficient for the RA to apply. *See McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'rs*, 650 F. App'x 703 (11th Cir.

[5] DEM is "a separate budget entity, as provided in the General Appropriations Act." *Id.* But under the RA, this distinction makes no difference. Here, the term "'[b]udget entity' means a unit or function at the lowest level to which funds are specifically appropriated in the appropriations act. *'Budget entity' and 'service' have the same meaning*." Fla. Stat. § 216.011(f) (emphasis added). Thus, for ADA and RA purposes, DEM certainly does fall under the Executive Office of the Governor, regardless of whether DEM is conceptualized as an EOG division or an EOG service. *See* Facts at ¶ 3, *supra.*

2016) (stating that if "any operation" of a Department "receives federal funds, the whole Department is covered by the [RA].").

### C. Defendants' Gubernatorial Press Briefings and Videos Are "Services, Programs, or Activities" of Entities Subject to the ADA and the RA

The ADA and the RA prohibit disability-based discrimination in the "services, programs, or activities" of a covered entity. 28 C.F.R. § 35.130. While the ADA does not explicitly define "services, programs, or activities," the final clause of the ADA's antidiscrimination provision is "a catchall phrase that prohibits all discrimination by a public entity, regardless of the context." *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998) (citation omitted); *see also* 28 C.F.R., part 35, app'x. B ("[T]itle II applies to anything a public entity does."). The RA, which is interpreted *in pari materia* with the ADA, *see Badillo*, 158 F. App'x at 214, defines a "'program or activity' as 'all of the operations of . . . a local government.'" 29 U.S.C. § 794(b)(1)(A).

Here, the Governor's press briefings qualify as a covered program or activity, as do the filming and online publication of the Governor's press briefings by the EOG and FSU. Although the addresses are termed "press briefings," the

term is a misnomer, as the Governor *regularly* uses these addresses to speak directly to Floridians, without using the press as an intermediary.[6]

---

[6] *See e.g.*, Press Briefing at Hard Rock Stadium (Mar. 22, 2020) https://thefloridachannel.org/videos/3-22-20-press-conference-on-coronavirus-covid-19/ (4:00 to 5:43) ("I think people look at it, and are like, 'Man, what, what, what can we do?' Here's the good news. There's a lot you can do in just your individual lives to be able to protect yourself from acquiring the virus, and from passing it on to somebody else. This is a virus that is contracted usually through respiratory droplets when somebody coughs or sneezes. So this is usually someone that you're in close contact with, within a six-foot radius. You also can get it if those droplets fall on a surface and you touch the surface and then touch your face, although most of the cases, by far, are from people whom you've been in close contact with. If you look at the cases in places like Broward and Dade, you have a pretty significant percentage related to international travel, and then another significant percentage related to people whom you've been in close contact with, known contacts, who are carrying the virus, and that close contact is what allows the transferability. So when people talk about things like 'social distancing,' what they're basically saying is, you know, protect yourself, you know, avoid any types of crowds of people, keep your distance if you are in public. If you stay in those comfort zones and don't go and have close contact with someone that's infected, then you are going to be protecting yourself. If you're making sure to wash your hands, and not touching surfaces that may be infected, you will be doing a lot to protect yourself. And so, that individual conduct is something that is very, very, significant."); Press Briefing at the Governor's Office (March 28, 2020) https://thefloridachannel.org/videos/3-28-20-press-conference-on-coronavirus-covid-19/ (01:37 to 02:11) ("And we also want to thank all the Floridians who really have taken the hygiene to heart. You have people doing hand sanitizer, washing their hands more religiously, not getting involved in large groups, and maintaining a 6 foot distance from people that type of social distancing is probably the most effective thing that you can do to blunt the spread, and so we've had millions of people throughout the state really change behavior, I know a lot of us haven't shaken hands with anybody for a month now, but those little things really make a difference, so thank you for doing it."); Press Briefing at OneBlood Headquarters (July 20, 2020) https://thefloridachannel.org/videos/7-20-20-press-conference-on-coronavirus-covid-19/ (00:06 to 00:37) ("The reason we are here today is because so many Floridians have asked 'What else can I do to be helpful

Courts that have addressed this question uniformly hold that press briefings qualify as covered programs and/or activities. *Nat'l Ass'n of the Deaf v. Trump,* 486 F. Supp. 3d 45, 57 (D.D.C. 2020) (treating presidential press briefings as programs and activities under RA); *Martinez v. Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020) (treating governor's press briefings as programs and activities under ADA); *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 640 (S.D.N.Y. 2013) (noting that there was "no dispute" that New York City's emergency preparedness program, which included city press conferences, was a "program" or "activity" within the meaning of the RA).

The Individual Plaintiffs and DRF request this Court find that both the EOG and FSU are covered entities under both the ADA and the RA as a matter of law, and that they are prohibited from discriminating against individuals with disabilities in the programs and services they provide, including those relating to the Governor's press briefings.

---

in the fight against COVID-19?' Obviously, folks have been diligently wearing face coverings, looking out for senior citizens, and we want you to continue to do that, but there is another way that you can help, and that is for those who have been infected with covid-19 and developed antibodies for the disease, to donate your blood.")

### D. Defendants' Failure to Provide ASL Interpreters at the Governor's Press Briefings Constitutes Discrimination as a Matter of Law

#### *1. Defendants Are Required to Provide Deaf Floridians with Effective Communications through an Auxiliary Aid*

As entities subject to the ADA and RA, Defendants are prohibited from discriminating against qualified individuals with disabilities in the programs or services Defendants provide. The regulations broadly prohibit discrimination—public entities discriminate if they fail to provide qualified individuals with disabilities the same opportunities and the same benefits, with the ability to achieve the same results, as people without those disabilities. *See* 28 C.F.R. § 35.130(b)(1).

The ADA and the RA include communications within the scope of potential discrimination by public entities. Such entities discriminate by failing to take appropriate steps to ensure that their communications with individuals with disabilities are "*as effective* as communications with others." 28 C.F.R. § 35.160(a)(1) (emphasis added); *see also* 28 C.F.R. § 35.130(b)(1)(ii)-(iii); 28 C.F.R. § 41.51(b)(1)(ii)-(iii). In other words, public entities must provide equally effective access to communications regarding their programs, services, and activities to people with disabilities as to those without. 28 C.F.R. § 41.51(b)(1)(ii)-(iii); *Silva v. Baptist Health South Florida, Inc.*, 856 F. 3d 824 (11th Cir. 2015) (finding that the level of communication about medically-relevant

information to deaf patients must be substantially equal as to hearing patients); *see also Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 773–74 (11th Cir. 2020) ("When it enacted Title II, Congress was confronted with evidence that deaf people often cannot access government meetings either due to a lack of interpreters or other necessary accessibility features.") (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 391-424 (2001) (App. C. to opinion of Breyer, J., dissenting) (noting that Congress received evidence of, *inter alia*, (1) the "government fail[ing] to provide interpretive services for deaf people at [a] school budget hearing;" (2) "public functions fail[ing] to provide interpretive services for deaf people;" (3) "state and local government meetings fail[ing] to provide interpretive services for deaf people")).

To ensure equally effective access and avoid discrimination on the basis of disability, public entities must make reasonable modifications to policies, practices, and procedures through "auxiliary aids." 28 C.F.R. § 35.130(b)(7). The ADA and the RA's regulations require that public entities "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. §35.160(b)(1); *see* 28 C.F.R. § 42.503(f); *Alexander v. Choate*, 469 U.S. 287, 309 (1985) ("The regulations implementing § 504 are consistent with the view that reasonable adjustments in the

nature of the benefit offered must at times be made to assure meaningful access.") (citations omitted). In the context of communications, auxiliary aids should reasonably modify a public entity's communications such that an individual with a disability can access them in an equally effective way. 28 C.F.R. § 35.160(b)(1); *see* 28 C.F.R. § 42.503(f).

***1. Defendants Failed to Give Primary Consideration to Plaintiffs Aponte's and DRF's Requests for ASL Interpretation***

To determine which auxiliary aids public entities must provide as reasonable modifications (and therefore not discriminate), public entities must give primary consideration to the requests of people with disabilities to determine, *for themselves*, what auxiliary aid or service will best provide equally effective access. 28 C.F.R. § 35.160(b)(2); *see also* 28 C.F.R. § 35.160(b)(2) ("a public entity shall give primary consideration to the requests of individuals with disabilities"); DOJ Title II Technical Assistance Manual, II-7.1100 (*available at* https://www.ada.gov/taman2.html#II-7.1100) ("Some individuals who were deaf at birth or who lost their hearing before acquiring language, for example, use sign language as their primary form of communication and may be uncomfortable or not proficient with written English, making use of a notepad an ineffective means of communication."). Stated differently, "[t]he public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services *of their choice*," and "*shall honor the choice unless* it can demonstrate that

another effective means of communication exists." 28 C.F.R. part 35, app'x. A (emphasis added); *see also* DOJ ADA Requirements: Effective Communication at 6 (Jan. 2014), available at http://www.ada.gov/effective-comm.pdf ("When choosing an aid or service, title II entities are ***required*** to give primary consideration to the choice of aid or service requested by the person who has a communication disability. The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available . . . .") (emphasis in original).

Under the plain text of the ADA and DOJ regulations, an ASL interpreter constitutes one such auxiliary aid or service. 28 C.F.R. § 35.104(1). The regulations explicitly define "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103(1); 28 C.F.R. § 35.104.

Here, it is undisputed that because they are deaf, the Individual Plaintiffs cannot access the Governor's press briefings without reasonable modifications. It is also undisputed that Mr. Aponte and DRF have requested that Defendants provide an auxiliary aid—specifically, ASL interpreters—to ensure equally effective access to gubernatorial press briefings on COVID-19 and hurricanes. Facts at ¶ 1, *supra.* Indeed, by initiating this action and requesting ASL

interpretation, there can be no question that Plaintiffs made clear requests for ASL interpretation. *Id.*

Nevertheless, the EOG only sporadically provides ASL interpreters at gubernatorial press briefings on hurricanes. Facts at ¶ 9, *supra.* The EOG has failed to provide any ASL interpreters at gubernatorial press briefings on COVID-19 since August 2020. *Id.* And FSU has never provided ASL interpreters at any gubernatorial press briefings. Facts at ¶ 12, *supra.* This failure constitutes discrimination unless Defendants can demonstrate another auxiliary aid is equally effective for Mr. Aponte and DRF members who are similarly situated. For the reasons described in the section below, Defendants cannot do so as a matter of law.

***2. Closed Captioning Is Not Equally Effective to ASL Interpretation***

Captions do not satisfy Defendants' obligation to ensure that their communications with deaf users of ASL concerning COVID-19 and hurricanes is as effective as their communications with the hearing public. There is no material dispute of fact that (a) closed captioning is not equally effective as ASL interpretation for deaf persons who use ASL, (b) Plaintiff Carlos Aponte cannot read and understand written English, and (c) many deaf Floridians who rely on ASL—represented by Plaintiff DRF—cannot read and understand written English.

*First*, the unrebutted opinions of Plaintiffs' linguistics expert, Dr. Judy Shepard-Kegl, demonstrate that closed captioning in written English is not an equal means of communication when compared with ASL interpretation.

Deaf people are a linguistic and cultural minority who remain communicatively disadvantaged, as many deaf people do not attain competence in either written or spoken English. Facts at ¶ 6, *supra*. The "hard reality" is that "50% of the Deaf population in the United States reads English at a fourth-grade level or below." Facts at ¶ 8, *supra*. Fluency in English is "often more challenging for Deaf individuals because of lack of access to the spoken English around them." *Id.* The innate differences between ASL and English also compound this issue, with deaf persons who use ASL often relying on and using their knowledge of ASL to attempt to understand written English, which often leads to incorrect inferences about the message. Facts at ¶ 7, *supra*. Thus, contrary to popular belief, written communication in English does not provide effective communication for many deaf individuals, and indeed, cannot substitute for ASL interpretation. Facts at ¶ 8, *supra*.

For a hearing person, written English text and spoken English dialogue may be interchangeable, but for a deaf person who relies on ASL, a written English text lacks the same "message equivalence" to ASL, given the languages' distinct grammar, structure, and syntax. *Id*. The grammar and syntax of ASL differs so

greatly from English that ASL has more in common with Russian. Facts at ¶ 6, *supra.* For example, the English language typically adds suffixes to words to indicate person, number, and tense. Facts at ¶ 7, *supra*. ASL, on the other hand, is a "polysynthetic language" that can express the same idea in a single word where it would take an entire English sentence to convey. *Id.* Finally, ASL is more than a language preference; it is the primary method of communication for much of the deaf population, including Mr. Aponte, as ASL is the only available means for many deaf people to communicate effectively and reliably. Facts at ¶ 8, ¶ 13, *supra.*

For these reasons, solely providing closed captioning for the Governor's press briefings will never make those communications as equally effective as ASL interpretation to the deaf persons who rely on ASL. Because an estimated half of the deaf population reads below a fourth grade level, Defendants' refusal to provide an ASL interpreter excludes a large portion of the approximately 820,000 deaf Floridians from the Governor's press briefings. Facts at ¶ 1, ¶ 8, *supra.* Due to the innate differences between ASL and English, deaf persons who rely on ASL will *never* be able to access the Governor's press briefings using closed captioning alone, regardless of the captions' speed or accuracy.

*Second*, Mr. Aponte exemplifies the discriminatory impact of Defendants' stance. Mr. Aponte is a deaf resident of Florida whose preferred and primary

means of communication is ASL; he is extremely limited in his ability to read and communicate in English. Facts at ¶ 13, *supra*. Mr. Aponte was born deaf and experiences hearing loss in the profound to severe category today. *Id.* Mr. Aponte consistently relies upon ASL users and interpreters to support him in various aspects of his life. *Id.* He cannot read and understand his mail or complete written paperwork and must rely upon ASL users and interpreters to read these documents for him and interpret them into written English. *Id.* Mr. Aponte uses ASL at medical appointments as he cannot communicate via written notes in any capacity. *Id.* When Mr. Aponte watches television, he relies exclusively on the images on screen. *Id.* If anyone at any time is communicating in English, spoken or written, Mr. Aponte requires an ASL interpreter to communicate. *Id.* Given Mr. Aponte's inability to understand English, he cannot understand closed captioning whatsoever. *Id.*

Mr. Aponte's performance on a Communication Skills Assessment (CSA) further demonstrates these limitations. In this assessment, Mr. Aponte was asked to read sixteen English words and either sign or draw the word back to the assessor. Facts at ¶ 14, *supra.* Of these sixteen words, Mr. Aponte correctly identified only two—apple and door. *Id.* Mr. Aponte was also asked to read nine English sentences and, when presented with four new sentences, select the one

sentence with the same meaning. *Id.* Mr. Aponte only did this correctly for one English sentence out of nine—a number far lower than chance. *Id.*

*Third*, Mr. Aponte is not alone. His inability to understand written English is common among deaf persons, including numerous deaf Floridians represented by DRF. This Court has already held that DRF has associational standing to sue on behalf of its members given DRF's status as Protection & Advocacy System ("P&A") for individuals with disabilities in Florida. Facts at ¶ 1, *supra*; Order on Mot. to Dismiss and Strike 8 n.4, ECF No. 65. DRF advocates on behalf of all deaf and hard of hearing individuals in Florida who use ASL. Federal statutes charge DRF with advocating—and if necessary, litigating—on behalf of disabled Floridians, including deaf and hard of hearing individuals. Facts at ¶ 1, *supra*; U.S.C. § 15001, Pub. L. No. 106-402.

DRF has directly represented 1,600 individuals who are deaf. Facts at ¶ 1, *supra.* Under its statutory mandate, DRF also represents the approximately 800,000 people who are deaf in Florida. *Id.* Like Mr. Aponte, deaf members of this population exclusively use and rely on ASL to communicate. Facts at ¶ 1, ¶ 6, ¶ 8, *supra*. By failing to provide ASL interpreters at the Governor's press briefings, Defendants discriminate against these deaf individuals, including Mr. Aponte as an individual plaintiff as well as all of the deaf users of ASL whom DRF represents.

Plaintiffs presented overwhelming testimony that Mr. Aponte and deaf Floridians like him require interpreters to access the Governor's briefings. Plaintiffs have also established that ASL is Mr. Aponte's primary and preferred method of communication and that he, DRF, and all Plaintiffs, have consistently requested Defendants provide ASL interpretation, since before the inception of this lawsuit. In response, Defendants appear to argue that closed captioning provides communication as effective as that of an ASL interpreter. But Defendants' have not provided any expert testimony to support their position that closed captioning provides any of the Plaintiffs, let alone Mr. Aponte and similarly-situated deaf Floridians, with equally effective access to the Governor's briefings. Defendants bear the burden to do so, given Title II's mandate that they give primary consideration to the Plaintiffs' request for ASL interpretation. 28 C.F.R. § 35.160(b)(2); DOJ ADA Requirements: Effective Communication at 6 (Jan. 2014), available at http://www.ada.gov/effective-comm.pdf. Thus, Defendants simply have not and cannot raise *any* genuine issue of material fact to support a position that closed captioning is a sufficient auxiliary aid for Mr. Aponte and similar deaf DRF constituents as a matter of law.

## II. Defendants Have Not Demonstrated that Providing ASL Interpreters Constitutes an Undue Burden or Fundamental Alteration as a Matter of Law

ADA and RA regulations require that public entities furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities . . . including members of the public . . . an equal opportunity to participate in, and enjoy the benefits of a service, program, or activity," 28 § 35.160(b)(1), unless it would necessitate "a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Shotz v. Cates*, 256 F.3d 1077, 1081 n. 4 (11th Cir. 2001) (citing 28 C.F.R. § 35.150(a)(3)); 28 C.F.R. § 35.164; *see also Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1082-1083 (11th Cir. 2007) (citing *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) (stating that Title II requires that public entities make "'reasonable modifications' that would not fundamentally alter the nature of the service provided . . . [or] impose an undue financial or administrative burden" ).

Here, Defendants failed to provide any facts to establish that the provision of ASL interpreters constitutes either an undue burden or fundamental alteration to their services and programs. *See, e.g.*, *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 773 (11th Cir. 2020).

### A. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute a Fundamental Alteration

A proposed accommodation amounts to a fundamental alteration if it would eliminate "an essential aspect of the relevant activity." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1221 (11th Cir. 2008) (citations omitted). The Eleventh Circuit has described this standard as "the difference between an accommodation that is required and a transformation that is not is the difference between saddling a camel and removing its hump." *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259 (11th Cir. 2019) (cleaned up).

Defendants have not identified even one way in which providing ASL interpreters at the Governor's press briefings would fundamentally alter the nature of the service offered—that is, the press briefing. Indeed, the EOG's representative on this very topic could not point to a single example when asked. Facts at ¶ 9, *supra.* This is not surprising: The function of an ASL interpreter is merely to be present and interpret the words of the speaker such that a deaf person could understand the message being conveyed. Facts at ¶ 6, *supra* Nothing about the presence of an ASL interpreter alters the message of the Governor's press conference—in fact, it merely amplifies the message to a wider audience.

Similarly, the inclusion of an ASL interpreter at press briefings does not fundamentally alter the program or service that FSU provides—the broadcasting and posting of the Governor's press briefings. The addition of a visual element

does not change the nature of the press briefing, it simply allows more people to access it. Like captions, station logos, or "lower-third" informational graphics, an ASL interpreter merely provides something *in addition to* the program or service—it does nothing to *alter* that program or service. *See, e.g. McGann v. Cinemark USA, Inc.,* 873 F.3d 218 (3d Cir. 2017) ("[T]actile interpretation of a movie does not require any changes to the video or audio content of the movie, the screens or sound systems that present the movie . . . . . We thus do not see how it constitutes 'a modification that is so significant that it alters the essential nature of the . . . services.'") (internal citations omitted).

**B. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute an Undue Burden**

To determine whether a requested auxiliary aid constitutes an undue burden, courts must consider "whether the requested accommodation is both efficacious and proportional to the costs to implement it." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014). This requires courts to "weigh the respective costs and benefits of the accommodations to the parties." *Schaw*, 938 F.3d at 1266-67. Stated differently, courts perform a "balancing of the parties' needs." *Bhogaita*, 765 F.3d at 1288.

Defendants have not demonstrated that providing ASL interpreters at press briefings related to COVID-19 and hurricanes is unduly burdensome. To the contrary, the facts show that both the EOG Defendants and the FSU Defendants

have the ability and means to do so—though, as a practical matter, only one or the other need provide ASL interpreters to satisfy the obligations of both.

The EOG Defendants already have several contracts with interpreter agencies. [Policy]; *see Updike v. Multnomah Cnty.*, 870 F.3d 939, 957 (9th Cir. 2017) ("The County makes no argument that providing Updike with an interpreter or providing other auxiliary services, such as a TTD, would have been unduly burdensome. *Nor would this argument have much weight, given their existing contract with Columbia Language Services to provide those in custody with ASL interpreter services."*) (emphasis added). Beyond merely entering into contracts with interpreter agencies, the EOG Defendants have adopted an internal policy that outlines the process for how these agencies should be utilized. Facts at ¶ 9, ¶ 10, *supra*. The EOG Defendants thus already have a process in place to provide ASL interpreters at the Governor's press briefings.

Indeed, the EOG Defendants admit that it is not unduly burdensome to provide ASL interpreters at press briefings related to declared states of emergency. Facts at ¶ 9, *supra*. The only additional burden the EOG Defendants could identify for COVID-19 press briefings, for which there is not currently a state of emergency, was the financial cost of providing an interpreter without federal reimbursement. *Id.* Despite this, the EOG Defendants have produced no evidence regarding the cost of ASL interpreters. In any event, although budgetary concerns

are relevant to the fundamental alteration calculus, financial constraints alone cannot sustain a fundamental alteration defense, as numerous circuits have found. *See, e.g.*, *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005); *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013); *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182 (10th Cir. 2003).

FSU likewise cannot demonstrate undue burden. According to the report of John Brooks, an expert in the design and development of television production systems and facilities, it is technically feasible for TFC to add an on-screen "picture-in-picture" image of an ASL interpreter to the Governor's press briefings, using inexpensive broadcast devices that can be operated in seconds, with a few short button presses, either remotely or in person, without the need to hire new staff. Facts at ¶ 12, *supra*. TFC's Chief Engineer, Terry Longordo, did not dispute the conclusions, and he agreed that Mr. Brooks method could work. *Id.* Like the EOG Defendants, even if budgetary impact alone were sufficient, which it is not, FSU have offered no evidence to suggest the hiring of ASL interpreters would impose and undue financial burden.

## CONCLUSION

For the foregoing reasons, and any other reasons the Court deems appropriate and just, Plaintiffs Yelapi, Sanchez, Mariona, Michalka, Aponte, and Disability Rights Florida respectfully request that the Court:

- Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201, declaring that Plaintiffs Yelapi, Sanchez, Mariona, Michalka, Aponte, and the deaf Floridians DRF represents as a P&A are qualified individuals with disabilities under Title II of the ADA and Section 504 of the RA;
- Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201, declaring that Defendants are covered entities under both Title II and the RA;
- Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201, declaring that the Governor's press briefings, and TFC's coverage of those briefings is a program or service provided by Defendants as public entities;
- Award Plaintiffs reasonable attorney fees and costs; and
- Provide such other further relief as deemed just and proper.

Moreover, for the foregoing reasons, and any other the Court deems appropriate and just, Plaintiffs Carlos Aponte and Disability Rights Florida respectfully request that the Court:

- Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201, declaring that the actions and failures of Defendants with respect to press briefings on COVID-19 and hurricanes violate Title II of the ADA and Section 504 of the RA by subjecting these Plaintiffs to discrimination;
- Enter preliminary and thereafter permanent injunctive relief, pursuant to 28 U.S.C. § 2202, requiring Defendants to provide televised in-frame ASL interpretation at all press briefings designed to reach residents of Florida regarding COVID-19 and/or hurricanes that are conducted by the Governor;
- Order FSU to include a qualified ASL interpreter in The Florida Channel feed for all of the Governor's COVID-19 and hurricane briefings, either by including in the frame a qualified ASL interpreter located physically near the speaker, or by including in the frame a separate video feed of a qualified ASL interpreter being filmed in a remote location using picture-in-picture ("PIP") format;
- Order that, if FSU includes a qualified ASL interpreter in The Florida Channel feed by using a PIP format, then FSU shall make the video feed

of the qualified ASL interpreter available to television networks in a manner that allows the networks to include the qualified ASL interpreter in their broadcasts;

- Retain jurisdiction over this action to ensure compliance by Defendants with the orders of this Court regarding the mandates of the ADA and the RA;
- Award plaintiff reasonable attorney fees and costs; and
- Provide such other further relief as deemed just and proper.

Dated: October 18, 2022

Respectfully submitted,

*/s/ Ian S. Hoffman*__________
Ian S. Hoffman (*pro hac vice*)
Zachary A. Sweebe (*pro hac vice*)
Julia H. Wingfield (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts NW
Washington, DC 20001
Tel: 202-942-6406
ian.hoffman@arnoldporter.com
zachary.sweebe@arnoldporter.com
julia.wingfield@arnoldporter.com

*/s/ Ann Marie Cintron-Siegel*
Ann Marie Cintron-Siegel (FL Bar No. 0166431)
DISABILITY RIGHTS FLORIDA
1930 Harrison Street, Ste 104
Hollywood, FL 33020
850-488-9071 Ext. 9790

Lauren Brittany Eversole (FL Bar No. 120245)
DISABILITY RIGHTS FLORIDA
2473 Care Drive, Suite 200
Tallahassee, FL 32308
850-488-9071 Ext. 9702

*/s/ Leah Wiederhorn*
Leah Wiederhorn (*pro hac vice*)
Marc Charmatz
NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
301-587-1788

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

The undersigned hereby certifies that this motion and incorporated memorandum of law contains 9,995 words, excluding the case style, table of contents, table of authorities, signature block, certificate of compliance with local rule 7.1(F), and certificate of service. The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

/s/ Ian S. Hoffman
Ian S. Hoffman

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 18, 2022, a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will serve a copy via email to all Defendants' counsel on record.

/s/ Ian S. Hoffman
Ian S. Hoffman