**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| MICHAEL YELAPI; PATRICIA SANCHEZ; JAIME MARIONA; JULIA MICHALKA; CARLOS APONTE; and DISABILITY RIGHTS FLORIDA, <br>       *Plaintiffs*, <br><br> v. <br><br> RONALD DESANTIS, in his official capacity as Governor of Florida; THE EXECUTIVE OFFICE OF THE GOVERNOR; FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, the public body corporate acting for and behalf of Florida State University; and JOHN THRASHER, in his official capacity as President of Florida State University, <br>       *Defendants*. | Case No. 4:20-cv-00351-AW-MAF |

**PLAITIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT EOG'S**
**MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

172780478

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................1

**STATEMENT OF FACTS**..................................................................................3

I.      The Parties..............................................................................................3

II.     Deaf Users of American Sign Language ...............................................5

III.    The Governor's Press Briefings.............................................................6

IV.     Communication Abilities of Plaintiff Carlos Aponte...........................8

V.      The Communication Abilities of Michael Yelapi, Jaime Mariona, Julia
        Michalka, and Patricia Sanchez ............................................................9

**LEGAL STANDARD**........................................................................................12

**ARGUMENT**.....................................................................................................14

VI.     The EOG Has Not Shown That It Is Entitled To Summary Judgment Based
        On Subject Matter Jurisdiction..............................................................14

        A.      *The EOG's Failure to Communicate Effectively With Plaintiffs is
                an Ongoing, Cognizable Injury that Gives Rise to Standing* .............14

                1.      *Defendants' Failure to Provide Effective
                        Communications Constitutes an Ongoing Injury to
                        Plaintiffs* ........................................................................14

                2.      *The EOG Defendants Cannot Avoid Their Obligations
                        through Alternative Means of Communications* ...................15

                3.      *Plaintiffs Are Not Required to Engage in Futile Attempts
                        to Access Communications that the EOG Has Not Made
                        Available to Them* .........................................................16

        B.      *The EOG Defendants' Illegal Activity Continues and Plaintiffs'
                Claim Is Not Moot*........................................................................18

                1.      *EOG's Internal ASL Policy Does Not Render Plaintiffs'
                        Claim Moot*...................................................................19

                2.      The Policy Post Dates Plaintiffs' Case and Was Not the
                        Result of Substantial Deliberation........................................20

                3.      The EOG Defendants Have Not Unambiguously
                        Terminated the Challenged Conduct......................................22

i

## TABLE OF CONTENTS
### (cont'd)

Page

4. The EOG Has Not Maintained a Commitment to Their ASL Policy ........................................................................... 23

5. *Whether COVID-19 Is Currently a Declared State of Emergency Does Not Moot Plaintiffs' Claim* ........................................ 24

C. *The EOG is not immune from suit via sovereign immunity* ............................. 25

1. Sovereign immunity does not bar the ADA and RA claims ............................................................................. 25

2. Plaintiffs Can Proceed Under *Ex Parte Young* ..................................... 26

VII. Plaintiffs' Claim Does Not Present a Political Question and Is Justiciable ................ 27

VIII. The EOG Defendants' Motion Fails on the Merits Because They Have not Proven They Provide Plaintiffs with Effective Communication During the Governor's Press Briefings ........................................................................ 30

A. The EOG Has Not Demonstrated Closed Captioning is Equally Effective for All Plaintiffs ........................................................................ 31

1. *Alternative Forms of Access Do Not Constitute Equally Effective Communication* ........................................................ 31

2. Disputed Facts Preclude Summary Judgment for Plaintiffs Yelapi, Mariona, Michalka, and Sanchez ........................... 32

3. *Closed Captioning Is Not Equally Effective to ASL Interpretation for Carlos Aponte and Similarly Situated Deaf Floridians* ........................................................... 36

B. The EOG Has Not Proven the Provision of ASL Interpreters Is an Undue Burden or Fundamental Alteration as a Matter of Law ........................................................................................ 37

1. *Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute an Undue Burden* ................................. 39

2. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute a Fundamental Alteration ........................................................................ 40

C. The RA Applies Because the EOG Receives Federal Financial Assistance ........................................................................ 41

ii

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

IX.   **The Balance of the Equities Tips in Favor of Injunctive Relief for Plaintiffs**............42

**CONCLUSION** ...........................................................................................................43

172780478

## INTRODUCTION

Plaintiffs Michael Yelapi, Patricia Sanchez, Jaime Mariona, Julia Michalka, Carlos Aponte (together, the "Individual Plaintiffs") and Disability Rights Florida ("DRF") respectfully submit their opposition to the Motion to Dismiss or for Summary Judgment by Defendants Ronald DeSantis (the "Governor") and the Executive Office of the Governor ("EOG," together with the Governor, the "EOG Defendants"). ECF 129 ("Motion"). The Court should deny the Motion in full.

With a sense of déjà vu all over again, Plaintiffs respond to dismissal arguments bearing a striking resemblance to those this Court considered, and rejected, in the EOG Defendants' prior motion to dismiss. *See Yelapi v. DeSantis*, 525 F. Supp. 3d 1371 (N.D. Fla. 2021). The recycled arguments have not improved with time. Nor have they improved with discovery, when repackaged as an alternative motion for summary judgment.

The EOG Defendants failed their burden to demonstrate that this Court lacks subject matter jurisdiction. The EOG Defendants still do not provide effective communication in their press briefing videos, and each inaccessible video is a sufficient injury for purposes of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). The EOG Defendants' suggestions—that deaf people *rely on a third-party digest* of a press briefing, *accept their exclusion* and turn to other information sources, or *identify specific information they missed* from a

1

172780478

press briefing they can neither hear nor access—runs afoul of the ADA and the RA's fundamental principles of independence and nondiscrimination.

Plaintiffs' claims are not moot, and the EOG Defendants have failed their burden to demonstrate otherwise. The EOG Defendants' internal policy is not evidence of voluntary cessation as it is inconsistently followed and does not require that that equally effective communication be *provided*, rather than simply *requested*.

The EOG Defendants fail their burden to demonstrate a political question, as neither policy choices nor value determinations are at play, and there is nothing "political" about the question of whether to discriminate against deaf Floridians.

On the merits, the EOG Defendants failed to identify undisputed facts that show either that (1) closed captioning provides effective communication for *all* Plaintiffs, including Mr. Aponte and the deaf Floridians DRF represents, or that (2) providing ASL interpreters would cause an undue financial burden or fundamentally alter the press briefings.

In sum, the EOG Defendants have failed to show the absence of a genuine issue of material fact, especially when the evidence is viewed in the light most favorable to the non-movant Plaintiffs. The Court should dismiss the Motion in full.

172780478

## STATEMENT OF FACTS

**I.      The Parties**

1) The Individual Plaintiffs are deaf residents of Florida. *See e.g.,* ECF 127 at 22:8, 24:3-7; ECF 127-4 at 10:13, 48:7-13; ECF 127-3 at 50:14-19; ECF 127-2 at 9:19, 19:14-23; ECF 127-1 at 8:7, 143:21-144:1. DRF is a Protection and Advocacy System ("P&A") with a federal mandate to advocate for Floridians with disabilities. ECF 126-19 at 21:6-17; 42 U.S.C. § 15001, Pub. L. No. 106-402. DRF represents the approximately 820,000 deaf individuals who live in Florida.[1] ECF 126-19 at 15:11-19; 83:11-15. Plaintiffs requested ASL interpreters for the Governor's press briefings. *See* ECF 130-11 at 85:14-87:12; ECF 127-4 at 27:5-12; 39:6-13; 28:3-29:22; 102:14-103:4.

2) The EOG is an agency within Florida's executive branch. *See* ECF 127-15 at 67:15-23; ECF 127-17 at 23:18-23:23; ECF 127-14 at 23:17-24:20; ECF 127-16 at 21:19-25; *see also* Fla. Stat. § 14.201. The EOG has not disputed it is a "public entity" within the meaning of Title II of the ADA. *See* EOG Answer to Am. Compl., ECF No. 71 ¶ 226 ("Admitted").

---

[1]     As of the 2022 fiscal year, DRF directly serves forty-five hearing clients. This is a correction from Plaintiffs' Statement of Facts in ECF 131.

3

172780478

3) The Division of Emergency Management ("DEM") is a division of the EOG.[2] ECF 130-24; *see* ECF 127-16 at 16:9-18; ECF 130-22; Fla. Stat. § 14.2016(1). DEM appears within the EOG organizational chart, and reports to the EOG's Director of Policy & Budget. ECF 130-24. DEM's director is appointed by and serves at the pleasure of the Governor. Fla. Stat. § 14.2016(1). The EOG coordinates with DEM to hold the Governor's press briefings related to COVID-19 and hurricanes. ECF 127-14 at 59:4-60:17.

4) FSU is an institution of higher learning in the State University System of Florida. *See, e.g.*, Florida State University, *The Florida State University Faculty Handbook 2021-2022*, at 2 (June 2022) https://facultyhandbook.fsu.edu/sites/g/files/upcbnu471/files/FacHandbook2022-Jun-23.pdf; Fla. Stat. § 1000.21(6)(b). FSU is the project recipient and holder of the contract to produce and operate the public affairs programming service The Florida Channel ("TFC"). ECF 130-6 at 48:21-49:3; ECF 130-26. TFC is a department of WFSU, which is part of FSU. ECF 130-23.

---

[2]    DEM's 2021-22 budget is $1,663,647,998, of which $1,426,522,931 is federal funding. Def. Ronald DeSantis and EOG's Resp. to Pl.'s Written Questions at 2. Almost $1.4 billion is provided by the Federal Emergency Management Act for emergency response, recovery, and mitigation in Florida. *Id.*

172780478

## II.   Deaf Users of American Sign Language

6)   Deaf people are a linguistic and cultural minority who remain communicatively disadvantaged, as many deaf people do not attain competence in written or spoken English.  ECF 130-13 at 11, 24, 45.  ASL is the primary and preferred method of communication for many deaf people, including the Individual Plaintiffs.  *Id.* at 45.  The function of an ASL interpreter is to interpret the words of the speaker such that a deaf person could understand the message.  *See generally id.,* App'x D at 54.  ASL is visual and gestural language, but is not a manual "version" of any spoken language, including English; it is an independent language informed by the unique linguistic experiences, and needs, of deaf Americans.  *Id.* at 13.  ASL's grammar and vocabulary are distinct from English, and ASL involves expressive movements and expressions not found in written communications.  *Id.* at 14-15.  The grammar and syntax of ASL has more in common with Russian than with English.  *Id.* at 13-17.

7)   ASL and English differ in many ways, including how they mark subjects and objects and how they ask questions.  *Id.* at 14.  English typically adds suffixes to words to indicate person, number, and tense, while ASL is "polysynthetic" and can express in one word an idea that, in English, may require a sentence.  *Id.* at 14-15.

5

8) For a hearing person, written English text and spoken English dialogue may be interchangeable, but for a deaf person who uses ASL, written English text lacks the quality of "message equivalence." *Id.* at 13. Thus, many deaf people do not attain competence in written or spoken English. *Id*. at 24. English fluency is "often more challenging for Deaf individuals because of lack of access to the spoken English around them." *Id*. at 22. Fifty percent of the American deaf population reads English at or below a fourth-grade level. *Id.* at 24. For many deaf people, ASL is the only means of providing and receiving effective and reliable communication. *Id*. at 45.

### III. The Governor's Press Briefings

9) The Governor first held a press briefing on COVID-19 on February 27, 2020. ECF 19-21. Since February 2020, the Governor has routinely held press briefings on COVID-19. *Id.* Most of these press briefings have not included an ASL interpreter. *Id.* The EOG has failed to provide any ASL interpreters at gubernatorial press briefings on COVID-19 since August 2020. *Id*. The EOG has discussed providing ASL interpreters. ECF 127-14 at 79:4-82:3. While this case was pending, on May 9, 2022, the EOG enacted a policy that internally required the EOG to provide interpreters during declared states of emergency. ECF 130-25. Under the policy's stated terms, the EOG will *request* ASL interpreters only for "Covered Gubernatorial Press Briefing[s],"

6

172780478

which only includes those "intended primarily to disseminate health or safety-related information to the public regarding a declared or imminent state of emergency pursuant to section 252.36, Florida Statues."[3] *Id*. This policy was primarily drafted by lawyers, and a current EOG employee with requesting ASL interpreters for the press briefings was unaware of the ASL interpreting vendors the policy covered. ECF 127-14 at 77:11-78:3; ECF 127-15 at 33:11-34:6; ECF 127 at 38:9-12.

10) This year, the EOG solicited and executed contracts with vendors of ASL interpretation. ECF 127-14 at 96:7-21; ECF 130-25 at 2, n. 1. The EOG could not identify the fees or costs associated with the use of the ASL vendor contracts. ECF 127-16 at 88:11-20; ECF 127-15 at 45:16-19. Despite these contracts and its internal policy, the EOG did not provide ASL interpreters for over a third of the Hurricane Ian press briefings between September 25, 2022 and October 17, 2022. ECF 130-21.

11) The EOG films the Governor's press briefings with its own camera, and posts those briefings on the Governor's official social media pages, including

---

[3]  The EOG admitted it is not unduly burdensome to provide ASL interpreters for the Governor's press briefings during a declared state of emergency. ECF 127-16 at 87:50-9. The EOG identified only the cost of an ASL interpreter as the additional burden at a press conference where there is not a declared state of emergency. *Id.* at 91:16-19. The EOG could not identify how ASL interpretation would fundamentally alter the nature of the press briefings. *Id.* at 89:4-91:5.

7

Facebook and Rumble. ECF 127-14 at 36:3-17; 37:1-8. These social media platforms include automated closed-captioning. ECF 127-14 at 69:1-3; 70:14-25. The EOG does not itself provide closed captioning for the Governor's press conferences beyond this automated captioning. *Id.* The EOG media advisories are drafted and sent "from two hours to the night before" the press briefing, even typically in an emergency. ECF 127-14 at 34:5-9; 139:7-12.

12) TFC broadcasts the Governor's press briefings. ECF 130-12 at 19:19-20:2; ECF 130-6 at 30:6-20; ECF 127-14 at 70:10-11. TFC includes an archive of the Governor's briefings in a video library on its website. ECF 130-12 at 25:8-12; 26:4-17. TFC has never provided real-time ASL interpretation for the Governor's live press briefings. ECF 130-12 at 216:10-15.

## IV.    Communication Abilities of Plaintiff Carlos Aponte

13) Carlos Aponte was born deaf and experiences hearing loss in the profound to severe category today. ECF 127-5 at 133:7-133:21; ECF 13-17 at 2. His preferred and primary means of communication is ASL. ECF 13-17 at 2. Mr. Aponte testified that he could understand that ASL interpreter during his deposition and that she was clear. *Id.* at 53:4-5. Mr. Aponte further testified that his ASL skills are now better than his Puerto Rican Sign Language skills. *Id.* at 29:11-15. Mr. Aponte is extremely limited in his ability to read and

8

172780478

communicate in English.  *Id.* at 27:20-28:12; 36:1-23; 110:3-110:6; 113:7; 113:15; 133:21; ECF 130-17 at 2.  Mr. Aponte cannot read and understand documents in English and must rely upon ASL users to read and interpret the documents.  ECF 127-5 at 113:2-113:18.  He relies on ASL interpreters at medical appointments and cannot communicate via written notes, and when he watches television, he relies exclusively on the images on screen.  *Id.* at 34:15-20; 113:2-113:18; 121:5-121:9.   At work, where he works for a company cleaning, he communicates with his supervisor by gesturing and miming things out because his supervisor does not know ASL.  ECF 127-05 at 31:19-21; 40:22-41:1; 40:14-21.  When Mr. Aponte looks at a newspaper or any written news, he cannot understand the written English at all.  *Id.* at 37:19-25.  He relies on the pictures to "deduce what is going on."  *Id*.  He cannot understand closed captioning whatsoever.  *Id.* at 33:23-34:2; 110:5-6.  Mr. Aponte cannot read or write in any language.  *Id.* at 28:7-12

## V.    The Communication Abilities of Michael Yelapi, Jaime Mariona, Julia Michalka, and Patricia Sanchez

14)    Mr. Yelapi cannot effectively understand all written English messages unless ASL support is provided.  ECF 127-1 at 14:6-18; 15:9-14; 60:20-25; 61:1-9; 66:2-8; 99:6-25.  He received high school accommodations including speech therapy and additional tutoring.  *Id.* at 12:23-5; 13:1-7.  He required an ASL

9

172780478

interpreter in college.  *Id.* at 61:10-12; 63:12-25.  He uses ASL to communicate at work. *Id.* at 22:5-18.  He has difficulty communicating with non-signing work colleagues.  *Id.* at 21:10-11; 22:11-18.  He found the closed captioning of the Governor's press briefings difficult to understand without an ASL interpreter.  *Id.* at 66:2-8; 99:6-25.

15)   Mr. Mariona cannot effectively understand all written English messages unless ASL support is provided.  ECF 127-4 at12:1-22; 17:2-23; 19:11-20:1; 26:16-24. He requires assistance translating ASL into English when drafting and reading emails.  *Id. at* 12:1-22; 17:2-23; 19:11-20:1; 26:16-24.  He relies on pictures to help him understand when reading articles without the assistance of ASL interpretation.  *Id. at* 44:14-25; 45:1-24; 52:19-25.  In school, an ASL interpreter and tutor helped him with English.  *Id. at* 46:6-47:8.  He communicates with his family in ASL.  *Id. at*  78:2-4; 79:4-7.  He found the closed captioning at the Governor's press briefings difficult to understand without an ASL interpreter.  *Id.* at 32:2-8; 96:6-19. Before the lawsuit, he contacted the Governor's office to request ASL interpreters at the Governor's press briefings.  *Id.* at 27:5-21; 39:6-13; 28:3-29:22; 102:14-103:4.  Before the lawsuit, he also contacted TFC to request ASL interpreters be provided at the Governor's press briefings.  *Id.* at 27:5-21; 39:6-13; 28:3-29:22.

10

172780478

16) Ms. Michalka cannot effectively understand all written English messages unless ASL support is provided. ECF 127-3 at 130:17-131:17; 123:19-126:5; 143:22-144:12; 147:13-148:17; 151:15-152:16; 156:4-157:3. She was supported by an ASL interpreter in high school in combination with lip reading. *Id.* at 71:12-72:22. She struggles to understand closed captioning in single-speaker presentations, and her ability to understand depends on the context and the content of the English message. *Id.* at 114:19-115:1. She has found the Governor's press briefings difficult to understand without an ASL interpreter. *Id.* at 123:19-126:5; 143:22-144:12; 147:13-148:17; 151:15-152:16; 156:4-157:3.

17) Ms. Sanchez cannot effectively understand all written English messages unless ASL support is provided. ECF 127-2 at 28:1-28:20; 40:12-25; 47:8-17; 63:13-25; 73:12-74:3; 98:1-10. She required tutoring to understand English in college. *Id.* at 27:20-25. She struggled all her life until she was able to use an ASL interpreter. Id. at 27:4-8. When reading, Ms. Sanchez requires additional time, visualization, and examples to understand the English without ASL. *Id.* at 28:1-20. She has found the closed captioning at the Governor's press briefings difficult to understand without an ASL interpreter. *Id.* at 47:8-17; 63:13-25; 73:12-74:3; 98:1-10.

11

## LEGAL STANDARD

The EOG Defendants frame their brief as a Motion for Summary Judgment and a Motion to Dismiss, ECF 129, but the latter is an improper vehicle at this stage in the litigation.  A motion to dismiss tests the sufficiency of the Plaintiffs' Complaint and is limited to that pleading,[4] but here, the EOG Defendants draw their facts from the record.  *See id.* at 3-12.  To the extent that the EOG Defendants seek dismissal under Federal Rule 12(b)(6) for failure to state a claim, the appropriate outcome is to convert the motion into one for summary judgment only.  *See Poulson v. Publix Super Markets, Inc.*, 302 F. Appx. 906 (11th Cir. 2008).

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of proving an absence of genuine issue of material fact; only if the moving party meets that burden does the burden shift to the non-moving party to establish "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The Court must "review the evidence and all factual inferences drawn therefrom, in the light most favorable to the nonmoving party."  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (citation omitted).  When

---

[4] This Court has already determined Plaintiffs sufficiently pleaded their claims under Fed.R. Civ. Pr. 12(b)(6). *See* ECF 65.

12

deciding a motion for summary judgment, "it is not part of the court's function, to decide issues of material fact, but rather determine whether such issues exist to be tried." *Id.* at 919. The "court must avoid weighing conflicting evidence or making credibility determinations." *Id. (*citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")).

The same result ensues to the extent that the EOG Defendants seek dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). "When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990). When motions "implicate the merits of a claim, the full panoply of protections afforded the party opposing such a motion will apply." *Id.*; *see Douglas v. United States*, 814 F.3d 1268, 1281 (11th Cir. 2016) (Tjoflat, J., concurring) (noting that a factual challenge to subject matter jurisdiction is subject to the Rule 56 standard such that "the court is to view all facts and make all reasonable inferences 'in the light most favorable to the nonmoving party.'") (quoting *Hill v. Cundiff*, 797 F.3d 948, 967 (11th Cir. 2015)).

172780478

## ARGUMENT

**VI.   The EOG Has Not Shown That It Is Entitled To Summary Judgment Based On Subject Matter Jurisdiction**

### A.   *The EOG's Failure to Communicate Effectively With Plaintiffs is an Ongoing, Cognizable Injury that Gives Rise to Standing*

Plaintiffs' injuries are actual, imminent, particular, sufficiently concrete, and ongoing. Standing requires an "injury in fact"—an "invasion of a legally protected interest" that is "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations omitted). Plaintiffs have made the requisite showing of injury because (1) the failure to provide equally effective communication at the Governor's press briefings injures Plaintiffs, and the discriminatory behavior persists; (2) whether Plaintiffs can find the information presented at the Governor's press briefings from third-party sources shirks the EOG's affirmative accessibility obligations; and (3) Plaintiffs need not identify specific information they missed from the Governor's press briefings—such information is unknowable for the very reason of their disability.

### 1.   *Defendants' Failure to Provide Effective Communications Constitutes an Ongoing Injury to Plaintiffs*

Title II of the ADA recognizes failure to provide effective communication as a form of disability-based discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a) (prohibiting disability-based discrimination in any programs of any state or local

172780478

governmental entity).   The Eleventh Circuit recognizes that failure to provide equally effective communication is *in and of itself* a violation of federal law:

> [W]hat matters is whether the handicapped patient was afforded auxiliary aids sufficient to ensure a *level of communication* about medically relevant information substantially equal to that afforded to non-disabled patients.   In other words, the ADA and RA focus on the communication itself, not on the downstream consequences of communication difficulties . . .

*Silva*, 856 F.3d at 834 (emphasis in original).

Each of the Individual Plaintiffs attempted to access the Governor's Press Briefings but were excluded due to the lack of ASL interpretation.   Statement of Facts ("Facts") ¶¶ 13-17.   The undisputed record shows that the EOG Defendants still do not provide ASL interpretation at all gubernatorial press briefings on COVID-19 or hurricanes; whenever ASL interpretation is missing, Plaintiffs are excluded and suffer injury.   Facts ¶ 9-10.   The primary harm Plaintiffs have suffered will only continue, absent injunctive relief.

### 2. The EOG Defendants Cannot Avoid Their Obligations through Alternative Means of Communications

The EOG Defendants argue that "Plaintiffs obtain their information using the internet or other resources," and claim this obviates their affirmative obligations under the ADA and the RA.   ECF 129 at 19.   But the Court already acknowledged that this argument is "not about whether Plaintiffs have alleged a concrete and

15

172780478

particularized injury," as it instead "challenges the *degree* of Plaintiffs injury in a highly fact specific context." ECF 65 at 9. The claim goes to merits, not standing. *See* 28 C.F.R. § 35.160(b)(1); 28 C.F.R. § 35.160(b)(1); *see also* ECF 65 at 17.

The EOG Defendants are solely responsible to ensure that their services to the hearing public are also accessible to deaf Floridians, and they are solely responsible to provide appropriate auxiliary aids. *See* Section VIII(A), *infra*. Whether other sources provide partially overlapping information is irrelevant. Even a summary digest of a gubernatorial press briefing not only arrives long after the event in question, but it is presented in the style, scope, focus, and viewpoint of *someone other than the Governor*. Hearing Floridians can receive the Governor's press briefings on COVID-19 and hurricanes directly from the source; providing anything less to the Individual Plaintiffs robs them, and all other deaf Floridians, of their independence, in violation of federal law.

### 3. *Plaintiffs Are Not Required to Engage in Futile Attempts to Access Communications that the EOG Has Not Made Available to Them*

Courts have found that injury in fact "can be satisfied in ADA cases by showing that the plaintiff was deterred from attempting to visit a location or use a service because of alleged ADA non-compliance." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088 (9th Cir. 2020) (citing *Civil Rights Educ. and Enforcement Ctr. v. Hospitality Props. Tr.*, 867 F.3d 1093, 1098–99 (9th Cir. 2017)). This recognizes

16

that "when a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers" the plaintiff "need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury." *Id.* (quoting *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1135 (9th Cir. 2002)).

Here, the Individual Plaintiffs have actual knowledge that the EOG does not provide ASL interpretation at the Governor's press briefings, as evidenced by the undisputed facts and their bringing the instant lawsuit. *See* Facts ¶1, 9, 13-17. The EOG Defendants fail to consistently provide ASL interpretation at press briefings on hurricanes, and EOG's ASL Policy and personnel have clarified that ASL interpreters will not be provided at press briefings on COVID-19 outside a declared State of Emergency. Facts ¶ 9; *see also* Section VI(2), *infra*. The Individual Plaintiffs need not continually persist in their attempts to watch press briefings that they cannot effectively access.

The EOG Defendants' invented requirement was rejected by the Eleventh Circuit and this Court: *"Silva I* 'reject[ed] a requirement that a disabled [plaintiff] explain exactly what was poorly communicated when that [plaintiff] could not know that information precisely because of the disability," as it would be "exceedingly difficult for a deaf [plaintiff] to recount a conversation he or she could not hear." ECF 65 at 10; *Silva v. Baptist Health S. Fla., Inc.* ("*Silva I*"), 856 F.3d 824, 835 (11th Cir. 2017); *see McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d

17

1135, 1147 n. 8 (11th Cir. 2014) ("[A] showing that the auxiliary aids [a plaintiff] received to assist him in communicating were not sufficient to provide him with an equal *opportunity to benefit* from the healthcare provider's treatment is enough to establish a violation of both the RA and ADA.") (emphasis added); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) ("[T]he proper inquiry is whether the auxiliary aid that a hospital provided to its hearing-impaired patient gave that patient an *equal opportunity to benefit from the hospital's treatment*.") (emphasis added).

Here, the record includes ample evidence that Defendants fail to provide effective communication to the Individual Plaintiffs. Defendants have not met their burden to show that the undisputed record supports their arguments to the contrary.

### B. The EOG Defendants' Illegal Activity Continues and Plaintiffs' Claim Is Not Moot

The EOG Defendants failed to show that Plaintiffs' claim is moot. *First*, the EOG's internal ASL Policy does not moot Plaintiffs' claims, as the policy postdates this litigation, the policy does not unambiguously terminate the challenged conduct, and the EOG has not maintained any commitment to following it. *Second*, whether COVID-19 is currently a State of Emergency in Florida has no bearing on whether the EOG Defendants must provide ASL interpreters at the subject press briefings.

18

172780478

### 1.   EOG's Internal ASL Policy Does Not Render Plaintiffs' Claim Moot

"It has long been the rule that 'voluntary cessation of allegedly illegal conduct... does not make the case moot.'" *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (citations omitted).  Not only have Defendants failed to consistently provide interpreters for the press briefings at issue, but Defendants' recent policy offers no guarantee that their challenged conduct will cease.  Because Defendants are "free to return to [their] old ways," *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953), "[they] bear[] a heavy burden of demonstrating that [their] cessation of the challenged conduct renders the controversy moot," *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.").

In determining mootness based on voluntary cessation, courts consider (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) "whether the government's decision to terminate the challenged conduct was 'unambiguous'"; and (3) "whether the government has consistently maintained its commitment to the new policy or legislative scheme." *Id.* at 1257; *see also Rich*, 716 F.3d at 531-32.  Each factor weighs against a finding of mootness here.

19

### 2. The Policy Post Dates Plaintiffs' Case and Was Not the Result of Substantial Deliberation

The timing of a policy change is a critical factor in determining whether it was an attempt to manipulate jurisdiction. When voluntary cessation was "not made before litigation was threatened," this change is "late in the game" and, therefore, suspect. *Rich*, 716 F.3d at 352 (citation omitted); *see also Harrell*. Courts are skeptical of policy changes made without clear justification or deliberation, and those made behind closed doors or apart from standard practice. *See Harrell*, 608 *v. The Florida Bar*, 608 F.3d 1241, 1267 (11th Cir. 2010) (finding no mootness where agency took up the matter only at the urging of counsel after litigation was filed, made its decision in secrecy behind closed doors, and may have deviated from standard processes); *Doe*, 747 F.3d at 1325.

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173 (11th Cir. 2007) is instructive. There, the Eleventh Circuit held that "[defendant] cannot establish (indeed, has not even come close to establishing) that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur" where (1) "it took not only a lawsuit, but nine months of intense litigation" for defendant to enact a policy; (2) "[defendant] has continued to assert that it did not violate the ADA or the RA"; (3) "officials had discussed [the behavior] on several occasions"; and (4) "prior to the events giving rise to this case, [defendant] had other run-ins"

20

172780478

involving similar behavior.   505 F.3d at 1188 n.15 (internal citations omitted) (emphasis in original).

Here, the facts align with *Sheely*.  The EOG's ASL Policy was instituted in May of 2022, *twenty-one months* after this litigation commenced.  Kelly Ex. 2.  The EOG Defendants continue to maintain they have not violated the ADA or the RA. ECF 127.   EOG staff discussed the provision of ASL interpreters on several occasions.  Facts ¶ 9.  Several people reached out to the EOG before initiating this lawsuit.  Facts ¶ 1, 15.  As in *Sheely*, the facts show that the EOG Defendants "cannot establish" and "ha[ve] not even come close to establishing" the unlikelihood of recurrence necessary for a finding of mootness here.  *See* 505 F.3d at 1188 n.15.

The facts also show that ASL Policy was implemented at the behest of counsel, outside of standard practice.  Lawyers drafted the ASL Policy with little input from the EOG personnel charged with executing the policy and booking ASL interpreters in the past.  Facts ¶ 9.  An EOG employee with experience requesting ASL interpreters for the press briefings was unaware of the ASL vendor contracts in the policy.   *Id.*  Such circumstances "raise a substantial possibility" that the EOG has changed course "simply to deprive the court of jurisdiction, which itself prevents [the Court] from finding the controversy moot."  *Harrell*, 608 F.3d at 1267.

172780478

### 3.     The EOG Defendants Have Not Unambiguously Terminated the Challenged Conduct

The requirement that prior conduct be unambiguously terminated is a cornerstone of the voluntary cessation doctrine. *Wooten*, 747 F.3d at 1322.[5] Here, the ASL Policy has not terminated the conduct that Plaintiffs challenge in this suit, nor have Defendants *actually* ceased the violations alleged in the Complaint since implementing the ASL Policy. *See* Section B(1)(b), *supra*.

In any event, a subsequent policy can moot a claim only if, as a preliminary matter, it *actually addresses* the concerns raised by a plaintiff. *See Naturist Society v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992); *Layton v. Elder*, 143 F.3d 469, 471-72 (8th Cir. 1998) (holding that plaintiffs' claims were not mooted by county's adoption of a policy indicating intent to comply with the ADA and initiating the barrier removal process, as the steps, "while commendable, have not addressed the problem").

The ASL Policy is facially insufficient to meet the EOG Defendants' affirmative duty to provide equally effective communication. The policy does not guarantee effective communication or access to auxiliary aids. Instead, it states that the EOG will "request*"* ASL interpretation at certain press briefings. Facts ¶ 9.

---

[5]     Despite the EOG Defendants' argument for leeway, ECF 129 at 21, any favorable presumption attaches only *after* a government entity shows its conduct has been unambiguously terminated, a showing absent here. *Wooten*, 747 F.3d at 132.

172780478

Under the ADA and the RA, covered entities must *provide*, not just *request*, equally effective communication.  *See* 28 C.F.R. § 35.130(b)(1); 28 C.F.R. § 41.51(b)(1)(ii)-(iii).  Merely stating that EOG personnel will request an ASL interpreter in certain circumstances does not comply with the ADA and RA and does not unambiguously reject the challenged conduct.  *See Cobb*, No. 1:19-cv-03285-WMR at 22 ("While the ADA Policy certainly represents a step in the right direction, there is at least some evidence that the ADA Policy did not completely reject the challenged conduct."); *Harrell*, 608 F.3d at 1268 (rejecting mootness when the defendant "has not borne its heavy burden of showing that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expect to recur" (emphasis in original) (quotations and citations omitted).

### 4.    The EOG Has Not Maintained a Commitment to Their ASL Policy

The voluntary cessation doctrine requires that defendants show they have "maintained [their] commitment to the new . . . scheme." *Flanigan's Enters.*, 868 F.3d at 1262.

Here, the EOG Defendants have done no such thing.  They continue not to provide ASL interpreters at press briefings on hurricanes—an ASL interpreter was absent at *one third* of press briefings on Hurricane Ian.  Facts ¶ 10.  Even one missed briefing can be sufficient to weigh in Plaintiffs' favor.  *See Cobb*, No. 1:19-cv-03285-WMR at 22 ("the record shows that [defendant] has not followed the policy

23

172780478

in at least one circumstance."). The EOG Defendants have not provided an ASL interpreter at any press briefing on COVID-19 since August 2020, although the Governor gave such briefings throughout 2022. Facts ¶ 9.

Finally, the EOG's continued defense of their prior conduct weighs against mootness. *See, e.g.*, *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (noting that defendant "continues to defend the legality" of their conduct, so "it is not clear why [defendant] would necessarily refrain... in the future.").

### 5.    *Whether COVID-19 Is Currently a Declared State of Emergency Does Not Moot Plaintiffs' Claim*

The EOG appears to argue that because COVID-19 may no longer be emergent, Plaintiffs are not entitled to injunctive relief. ECF 129 at 20. But Plaintiffs did not limit their request to declared States of Emergency. *See* ECF 35 at 38-42. The Governor's actions belie the EOG's theory; COVID-19 press briefings persisted even *after* Florida lifted the State of Emergency. Facts ¶ 9.

COVID-19 remains a global health emergency, and like everyone else, Plaintiffs remain under a threat that the virus will evolve and outbreaks will increase. *See* World Health Organization, *Statement on the Thirteenth Meeting of the International Health Regulations (2005) Emergency Committee Regarding the Coronavirus Disease (COVID-19) Pandemic*, https://www.who.int/news/item/18-10-2022-statement-on-the-thirteenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-

24

172780478

(covid-19)-pandemic (Oct. 18, 2022); *see Roman Catholic Diocese of Brooklyn v. Cuomo,* 2020 WL 6948354, at *3 (U.S. Nov. 25, 2020) (holding injunctive relief necessary after the relevant COVID-19 restriction was lifted, because "applicants remain under a constant threat" of being subject to such restrictions in the future). Florida's lifting of the State of Emergency does not alter this fact, and accordingly, Plaintiffs' claim is not moot.

### C.    The EOG is not immune from suit via sovereign immunity

#### 1.    Sovereign immunity does not bar the ADA and RA claims

In a sentence, the EOG Defendants purport to "incorporate the arguments in their previous Motion to Dismiss"—*ten pages and about 2,675 words*—and essentially ask the Court to sift through their prior (unsuccessful) motion to dismiss, and develop a cogent argument.  ECF 129 at 17.  The Court should not entertain such tactics.

The EOG "did not seek leave of court to incorporate the arguments of one motion into another motion, which in any event is a practice courts of this district rarely permit for reasons of convenience as well as to enforce page-limitation restrictions." *Deforest v. Johnny Chisholm Glob. Events, LLC*, No. 3:08-cv-00498, 2010 WL 1792094, at *5 n.12 (N.D. Fla. May 4, 2010), *adopted*, 2010 WL 2278356 (N.D. Fla. June 4, 2010).  Had the EOG "incorporated" its arguments into the Motion, it would be 1,079 words over the limit.  The Eleventh Circuit rejected

25

similar incorporation tactics as "a mockery of our rules governing page limitations and length." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 (11th Cir. 2004). This Court also rejects them. *Smith v. Psychiatric Sols., Inc.*, No. 3:08-cv-00003, 2010 WL 11643318, at *1 n.2 (N.D. Fla. Dec. 21, 2010).

The Court already rejected and disposed of the EOG Defendants' sovereign immunity arguments. ECF 65 at 15. ("[I]f access to legislative information is enough to support abrogation—as the court found in *NAD*—then access to information from the head of Florida's executive branch would be enough too.") (citations omitted). No new arguments have been raised.

### 2.   Plaintiffs Can Proceed Under *Ex Parte Young*

This Court already held that Plaintiffs can proceed under *Ex parte Young*, and that the EOG is therefore not immune from suit. ECF 65 at 16-17 ("[I]t is unsurprising that other courts have applied *Ex parte Young* in Title II ADA cases.") (citing *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 774 (11th Cir. 2020) ("*NAD*"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288-89 (2d Cir. 2003) ("*Seminole Tribe* does not bar *Ex parte Young* relief under Title II against a state official."); *Randolph v. Rodgers*, 253 F.3d 342, 345-48 (8th Cir. 2001) (allowing plaintiff to pursue Title II injunctive relief against prison official under *Ex parte Young*); *Garrett*, 531 U.S. 374 n.9 (noting that government actors remain subject to Title I injunctive relief

26

under *Ex parte Young*)).  As the EOG Defendants raise no new facts to change this Court's prior holding, Plaintiffs can proceed under *Ex parte Young*.  *See* ECF 129.

The EOG Defendants nonetheless argue that EOG is not a "state officer," so the *Ex parte Young* exception should not apply.  ECF 129 at 17 (citing *Doyle v. Hogan*, 1 F.4th 249, 254 (4th Cir. 2021)).  But *Ex parte Young* is not limited to suits only against state officers.  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635 (2002) (holding "a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective").  Even the Fourth Circuit case that EOG cites does not hold that only "state officers" may be sued under this exception; it merely details circumstances in which state officers *can* be sued.  *Doyle v. Hogan*, 1 F.4th 249, 254 (4th Cir. 2021).  Whether EOG is a state officer has no bearing on *Ex parte Young*'s applicability here.

## VII.  Plaintiffs' Claim Does Not Present a Political Question and Is Justiciable

Plaintiffs ask the Court to encompass its role and decide whether the EOG's conduct runs afoul of the ADA or RA.  *See People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179, 1205 (N.D. Ala. 2020) (rejecting dismissal of claims as nonjusticiable political questions because it "would result in the court abdicating from its role to address disputes that arise under the Constitution or federal statutes,"

172780478

including the ADA) (citations omitted), *appeal dismissed*, No. 20-12184-GG, 2020 WL 5543717 (11th Cir. July 17, 2020).

The EOG wrongly frames accessibility as a political question involving "policy choices and value determinations" that it claims only it can make, but there is nothing "political" about the question of whether to *discriminate against deaf Floridians*. *See* ECF 129 at 12-14.

Plaintiffs' propose a clear standard that both the EOG and the Court can apply: Any gubernatorial press briefing on the subject of COVID-19 or hurricanes must have ASL interpretation. This is a clear and objective test that requires no discretion, strategy, or any value determination from the EOG. *Accord Id*.

The press briefings at issue are the result of careful planning, preparation, and forethought by the EOG Defendants—entities that know the press briefing's subject *well in advance*. Media advisories are drafted and sent "from two hours to the night before" the press briefing in question. Fenske Dep. at 34:5-9. Even in an emergency, the advisories are typically sent two and a half hours in advance, with subjects disclosed to the public. *See Id.* at 66:6-17; *Id.*, Ex. 4 ("Governor Ron DeSantis to Hold Press Conference Regarding Hurricane Sally"). *Id.*[6]

---

[6]    Thus, the EOG cannot claim the imminent risk exception under 28 C.F.R. § 35.160(c)(2)-(3), and are also within the typical emergency situations the EOG handles as a part of the services it provides to the public.

172780478

Both the Court and the EOG Defendants are capable of determining whether a press briefing will be about COVID-19 or hurricanes, and "those enjoined [would] know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1223 (11th Cir. 2000) (citations omitted).  And it is not unreasonable for the Court to expect ASL interpreters to arrive at press briefings that multiple press crews have no trouble timely attending.

For similar reasons, Defendants cannot theorize that the relief requested is not feasible—they must produce uncontroverted evidence that it cannot be done.  They have not done so, but instead, reference vague "difficulty" in securing ASL interpreters based on general impressions and unsubstantiated rumors from eras predating the regional ASL vendor contracts now in place.  ECF 129 at 7.[7]

Finally, this Court has already acknowledged that injunctive relief is available, especially given Plaintiffs' more detailed prayer for relief in the First

---

[7]    Ms. Kelley submitted a post-discovery affidavit stating "it was difficult" to obtain on-site interpreters for Hurricane Ian, but described *no alternate efforts* to secure ASL interpreters, including via remote video. *See* ECF 127-24 at 3-4.  Nor did she describe *personal difficulty* attending the press briefings.  *Id.*  Nothing suggests that any hired interpreters, full-time or term-limited, would have been unable to attend events that the Governor and the EOG staff attended *without issue*.

29

Amended Complaint.   ECF 65 at 18; ECF 35 at 38-42.   Indeed, this Court

specifically noted that "other courts have entered injunctive relief in other cases"

which further suggests injunctive relief is possible.   ECF 68 at 18 ("See *Martinez v.*

*Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020); *Nat'l Ass'n of the Deaf v. Trump*, 486

F.Supp. 3d 45, No. CV 20-2107 (JEB), 2020 WL 5411171 (D.D.C. Sept. 9, 2020).

Moreover, Plaintiffs' prayer for relief is more refined and detailed than before.

*Compare* ECF No. 1 at 25-26 (seeking "live televised in frame ASL interpretation

at all briefings designed to reach residents of Florida"), *with* FAC at 38-40 (seeking

"televised in frame ASL interpretation at all briefings designed to reach residents of

Florida regarding COVID-19 and/or impending hurricanes....")).

**VIII.   The EOG Defendants' Motion Fails on the Merits Because They Have not Proven They Provide Plaintiffs with Effective Communication During the Governor's Press Briefings**

Whether the press briefings at issue warrant ASL interpretation requires that

the Court engage in a fact-intensive inquiry to determine whether Defendants' non-

ASL communications with Plaintiffs are as effective as their communications with

hearing individuals, and whether Plaintiffs' requests for ASL interpreters rise to the

level of undue burden or fundamental alteration.   Thus, to prevail on their Motion,

the EOG Defendants must identify undisputed facts in the record that show either

(1) even though they have not provided an ASL interpreter, the alternative aid

provided—closed captioning—is as effective for *all* Plaintiffs, including Mr. Aponte

30

and the deaf Floridians DRF represents or (2) the provision of an ASL interpreter creates an undue financial burden on Defendants or causes a fundamental alteration to the Governor's Press Briefings.  *See NAD*, 980 F.3d at 773; *Chisolm v. McManimon*, 275 F.3d 315, 327 (3rd Cir. 2001).  Defendants have not done so.

## A.    The EOG Has Not Demonstrated Closed Captioning is Equally Effective for All Plaintiffs

### 1.    *Alternative Forms of Access Do Not Constitute Equally Effective Communication*

The EOG continues to conflate the issue of equally effective access, by asking the Court to consider "other sources" where Plaintiffs may be able to access the information the Governor provides during his press briefings and calling for the Plaintiffs to identify the information they haven't been able to access.  ECF 129 at 19.  This Court has already determined that the "downward consequences" of the information departed is irrelevant to the Court's inquiry as to whether communication is effective during the governor's press briefings.  ECF No. 65 at 10.  Indeed, the Eleventh Circuit has rejected the very argument the EOG Defendants continue to advance:  That if the Plaintiffs can glean the information in another way through a different source, there is no discrimination.  *Silva,* 856 F.3d at 835 ("[W]e reject a requirement that a disabled patient explain exactly what was poorly communicated when that patient could not know that information precisely because of the disability.").  This Court has done the same.  ECF 65 at 10.

31

Defendants' efforts remain unconvincing, and the question of whether Plaintiffs require an ASL interpreter to effectively communicate in this context remains a highly fact-specific inquiry that must focus on whether closed captioning—the only alternative auxiliary aid provided on screen during the Governor's press briefings—provides Plaintiffs with effective communication.[8] For Plaintiffs Yelapi, Mariona, Michalka, and Sanchez, the facts require a hearing in order for the Court to engage in the proper analysis; summary judgment is simply not appropriate as to them.  However, for Plaintiffs Aponte and DRF, the undisputed facts *already establish* that ASL interpreters are *necessary*.

### 2.    Disputed Facts Preclude Summary Judgment for Plaintiffs Yelapi, Mariona, Michalka, and Sanchez

The Individual Plaintiffs maintain they cannot understand the Governor's press briefings. Facts ¶ 13-17.  For this reason, they require an ASL interpreter in

---

[8]    Further, Defendants cannot rely on the imminent threat exception in 28 C.F.R. 35.160(c)(2)-(3) to the use of "third party ASL interpreters" for interpretation provided by other entities after the press briefing has been aired.  The imminent risk exception "is not intended to apply to the typical and foreseeable emergency situations that are part of the normal operations of [] institutions."  28 C.F.R. part 35, app A, 75 FR 56164.  Rather, it applies only "where any delay in providing immediate services to the individual could have life-altering or life-ending consequences."  *Id.*  Here, Defendants have sufficient time to plan a press briefing such that an interpreter could be provided and cannot show that press briefings are so immediate as to prevent imminent risk to Floridians life as the statute requires. Additionally, the Governor's press briefings are clearly the type of typical emergency situations the EOG and Governor handle on a regular basis and again, do not fall within the exception.

172780478

order to meaningfully access, in the form of effective communication, the Governor's press briefings. But for Plaintiffs Yelapi, Mariona, Michalka, and Sanchez, their effective communication claims present questions of fact that preclude summary judgment. *Silva v. Baptist Health S. Fla., Inc.,* 838 F. App'x 376 (11th Cir. 2020). Indeed, "[g]enerally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." *Liese v. Indian River City Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012) (citing *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001). For this reason, these Plaintiffs did not move for summary judgment on their effective communication claims in Plaintiffs' Motion for Summary Judgment. *See* ECF 130. At this stage, the Court must view all of the evidence in a light most favorable to these Plaintiffs as the nonmoving party and draw all reasonable inferences in these Plaintiffs' favor. *See Liese v. Indian River County Hosp. District*, 701 F.3d 334, 342. When the facts are viewed in this light, a reasonable fact finder could conclude that these four Plaintiffs do require an ASL interpreter to receive effective communication from the press briefings and the EOG's Motion must be denied.

The EOG offers no argument that Plaintiffs Yelapi, Mariona, Michalka, and Sanchez, as deaf individuals, are not qualified individuals under the law and require some form of auxiliary aid or service to access the Governor's press briefings. Rather, Defendants argue that instead of providing the auxiliary aid these Plaintiffs

33

request—an ASL interpreter—they "employed alternative but effective auxiliary aids." *Chisolm*, 275 F.3d at 327. Because the EOG argument conflicts with the regulatory mandate that a public entity honor a disabled person's choice of auxiliary aid," *id.* (citing 28 C.F.R. Pt. 35, App. A), the EOG must present undisputed facts that establish that the alternative aids provided to these Plaintiffs are as effective as an ASL interpreter. *See* 28 C.F.R. §§ 35.160(a)(1), (b)(1), and (b)(2); DOJ Title II Technical Assistance Manual, II-7.1100 (May 17, 2013), https://www.ada.gov/taman2.html#II-7.1100; DOJ ADA Requirements: Effective Communication at 6 (Jan. 2014), http://www.ada.gov/effective-comm.pdf. The EOG Defendants have not done so.

Instead, the EOG Defendants challenge Plaintiffs' testimony as untruthful and ask the Court to make assumptions and credibility determinations inappropriate for a summary judgment motion. *See Greer v. Ivey*, 767 Fed. Appx. 706, 710 (11th Cir. 2019) (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006) ("If the existence of a material fact turns on credibility determinations, then summary judgment is improper, and the case should proceed to trial.")). While Plaintiffs do use written English to communicate in various ways, their use of written English does not automatically translate into an ability to effectively communicate in writing, as explained by Plaintiffs' unrebutted expert report. JSK Report.

34

172780478

Indeed, Plaintiffs have raised genuine issues of material fact regarding the effectiveness of written material in the context of the Governor's press briefings. *See* Facts ¶ 13-17 . For example, while Mr. Mariona may use written English to communicate with family members, he also uses home signs and in school, where the reading and writing was arguably more complex than with family members, he required the assistance of an ASL interpreter to read and write his coursework. Facts ¶ 15. Mr. Yelapi, Ms. Sanchez, and Ms. Michalka, who acknowledge their use of written English in work, all testified that the closed captioning for the Governor's press briefings is difficult to follow. Facts ¶ 14, 16, 17. And as the law explains, the type of auxiliary aid or service necessary to ensure effective communication depends not only on the method of communication used by the individual but also on the nature, length, and complexity of the communication taking place; and the complexity of what is being communicated. 28 C.F.R. § 35.160(b)(2).

In essence, the EOG Defendants ask the Court to improperly weigh the facts and make a credibility judgment that these Plaintiffs can, *despite their contrary testimony*, read English well enough for captions to provide sufficient access, and to decide that one statement is truthful. But when the facts are viewed in a light favorable to these Plaintiffs, it is clear that a reasonable fact-finder could determine these Plaintiffs require an ASL interpreter for the Governor's press briefings. Thus, summary judgment is improper and the Motion must be denied.

35

172780478

### 3. Closed Captioning Is Not Equally Effective to ASL Interpretation for Carlos Aponte and Similarly Situated Deaf Floridians

In contrast, discovery has clearly shown that for Plaintiff Aponte and other similarly situated deaf Floridians, as represented by DRF, any written source, including closed captioning, is inaccessible and cannot serve as an alternative source of information.  It is undisputed that Mr. Aponte is fluent in ASL, that he relies on ASL as his primary and preferred method of communication, and that he cannot read or write English.  It is thus undisputed that Mr. Aponte and similarly situated deaf DRF constituents require an ASL interpreter to access the Governor's press briefings.  Facts ¶ 13, 6-8. For these reasons, he requires an ASL interpreter to access the Governor's press briefings.  Defendants have not presented any contrary evidence.

Rather, the EOG asks the Court to make various improper assumptions: that because Mr. Aponte never studied ASL he is not fluent in it; that because he utilized a CDI for his deposition, an ASL interpreter would not provide effective communication for a press briefing; that because Mr. Aponte does not use ASL at work, ASL is not his primary method of communication.  *See* ECF No. 129 at 5. These assumptions are improper for a summary judgment motion, and they are simply false. *See* Facts ¶ 13 (Mr. Aponte's reliance on ASL).

36

Like Mr. Aponte, deaf Floridians who rely on ASL to communicate also require ASL interpreters for effective communication. As Plaintiffs' unrebutted expert report establishes, written communication in English does not provide effective communication for many deaf users of ASL. *Id.* For a deaf person who relies on ASL, written English text lacks "message equivalence" to ASL, given the languages' distinct grammar, structure, and syntax. *Id.* Indeed, fifty percent of the deaf population in the United States reads English at a fourth-grade level or below. *Id.* For these deaf Floridians, an ASL interpreter is necessary for them to receive effective communication during the Governor's press briefings.   The EOG Defendants have not presented any fact to dispute the evidence Plaintiffs presented on this issue.  As such, the Motion must be denied.

**B.     The EOG Has Not Proven the Provision of ASL Interpreters Is an Undue Burden or Fundamental Alteration as a Matter of Law**

The EOG bears the burden of establishing, by undisputed facts, that the provision of ASL interpreters for press briefings on COVID-19 and hurricanes would constitute an undue burden and/or fundamental alteration to its services and programs.  *See* 28 CFR 35.150(a)(3), 35.164.   While compliance with Title II obligations "would in most cases not result in undue financial and administrative burdens on a public entity," 28 C.F.R. Part 35 App. B (analyzing Sections 35.150 and 35.164), where a public entity asserts these affirmative defenses, it must provide specific evidence to support its assertions:

172780478

> "In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity *has the burden of proving* that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee *after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion.*"

28 CFR 35.150(a)(3) (emphasis added); *see also Chisolm v. McManimon*, 275 F.3d 315 (3d Cir. 2001) ("To qualify for the Section 35.164 exemption, a public entity must provide a written statement explaining its conclusions."); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096-97 (9th Cir. 2013); *Am. Ass'n of People With Disabilities v. Hood*, 278 F. Supp. 2d 1345, 1353 n. 7 (M.D. Fla. 2003).

The EOG has provided no such written statement to meet its burden under Section 35.164, and therefore is prevented from making such arguments. Without such a statement, the EOG does not qualify for either the undue burden or the fundamental alteration defenses. And even if it had, the EOG has still failed to provide any undisputed facts to establish that the provision of ASL interpreters constitutes either an undue burden or fundamental alteration to their services and programs. *See, e.g.*, *NAD*, 980 F.3d at 773. In any event, these are factual issues that should not be decided on summary judgment. *See Redding v. Nova Se. Univ.,*

172780478

*Inc.*, 165 F. Supp. 3d 1274, 1298 (S.D. Fla. 2016) ("Whether a proposed modification would impose an undue burden or require a fundamental alteration is generally a question of fact" that precludes summary judgment).

### 1. Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute an Undue Burden

Title II obligations "would in most cases not result in undue financial and administrative burdens on a public entity."  28 C.F.R. Part 35 App. B (analyzing Sections 35.150 and 35.164).  That is also the case here.

The EOG focuses on the cost of providing ASL interpreters at the Governor's press briefings, ECF 127, but courts frequently reject public entities' claims of undue burden based on cost alone.  *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008); *Reyazuddin v. Montgomery County*, 789 F.3d 407, 417 (4th Cir. 2015) (reversing grant of summary judgment on county's claim that making software accessible for county employee at a cost of $648,000 would be an undue hardship because district court focused on cost alone).  Further, the EOG has presented *no evidence* of the actual cost of providing ASL interpreters at the Governor's press briefings (whether by direct hire or by use of the vendor contracts). Instead, the EOG states, without support, that financial costs include the interpreter's fee, travel, and hotel accommodations.  *See* ECF 129 at 28.

Additionally, it is difficult for the EOG to argue that the provision of ASL interpreters is undue when it has both an internal policy to provide ASL interpreters

172780478

and established contracts with interpreter agencies. Facts ¶ 9. The existence of this policy and the related contracts with ASL vendors show that the administrative burden of providing ASL interpreters at the Governor's press briefings is low, because a process is in place and contracts exist that could be readily used to provide ASL interpreters. *See Updike v. Multnomah Cnty.*, 870 F.3d 939, 957 (9th Cir. 2017) ("[Defendant] makes no argument that providing [Plaintiff] with an interpreter or providing other auxiliary services, such as a TTD, would have been unduly burdensome. *Nor would this argument have much weight, given their existing contract with Columbia Language Services to provide those in custody with ASL interpreter services.*") (emphasis added).

### 2.    Defendants Have Not Demonstrated that Providing ASL Interpreters Would Constitute a Fundamental Alteration

The EOG offers no argument or valid reason as to how or why the provision of ASL interpreters rises to the level of a fundamental alternation. *See* ECF 129.

A proposed accommodation amounts to a fundamental alteration if it would eliminate "an essential aspect of the relevant activity." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1221 (11th Cir. 2008) (citations omitted). To the extent that the provision of an ASL interpreter adds a visual element to the briefing, "[t]he addition of a visual element does not change the nature of the press briefing, it simply allows more people to access it. Like captions, station logos, or "lower-third"

172780478

informational graphics, an ASL interpreter merely provides something *in addition to* the program or service—it does nothing to *alter* that program or service. *See, e.g., McGann v. Cinemark USA, Inc.,* 873 F.3d 218 (3d Cir. 2017). Because the EOG has not shown that Plaintiffs' proposed relief constitutes a fundamental alteration, it has not met its burden on summary judgment.

## C. The RA Applies Because the EOG Receives Federal Financial Assistance

The RA prohibits entities from discriminating in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, any entity— private or public—that receives federal financial assistance is bound by the same substantive requirements as Title II of the ADA. *See Badillo*, 158 F. App'x at 214; *Cash*, 231 F.3d at 1305 n.2. Discovery has revealed that the EOG is clearly a recipient of federal financial assistance, qualifying it to requirements of the RA.

DEM receives millions of dollars in federal funding to support its operations each year. Facts ¶ 3. DEM is a division "established *within* the Executive Office of the Governor," and its director "shall be appointed by and serve at the pleasure of the Governor and shall be the head of the division for all purposes." Fla. Stat. § 14.2016(1) (emphasis added). DEM is included in the EOG organizational chart, reports to the EOG's Director of Policy & Budget, and is a functional arm of the EOG. *Id.* The EOG considers DEM to be fully operating in and functioning as a part of the EOG. *Id.* The EOG cannot, without support, baldly state that DEM is a

41

"cranny" of the EOG when it is one the three main branches of the operations.  ECF 129 at 29.  DEM's receipt of federal funding is sufficient to qualify it under the RA.

The EOG Defendants' reliance on *Shotz v. Am. Airlines, Inc.* is inapposite. 420 F.3d 1332, 1336 (11th Cir. 2005).  *Shotz* addressed an unrelated DOT-specific regulation, 49 C.F.R. § 27.9, and merely observed that "Congress *usually* requires" that such federal aid recipients give written assurances of future RA compliance. 420 F.3d at 1336 (emphasis added).  *Shotz* did not establish a written assurance requirement, and did not turn on their presence or absence; instead, *Shotz* turned on the text of the relevant congressional act granting such funds, and DOT's amicus brief explicitly denying that the funds constituted federal financial assistance.  *Id.* The EOG Defendants do not apply *Shotz*, and no analogous circumstances exist here.

## IX.    The Balance of the Equities Tips in Favor of Injunctive Relief for Plaintiffs

The public interest in equal access and full participation is best served where individuals with disabilities are permitted to use the aids, services, and assistive technology they choose to maximize participation in society.  *Enyart v. Nat'l Conf. of Bar Exam., Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (holding that "the public clearly has an interest in the enforcement of its statutes" and "[i]n enacting the ADA Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities").  The EOG posits that "the

42

balance of harms and the public interest" weigh against injunctive relief, arguing that providing ASL interpretation would not discernibly benefit Plaintiffs. ECF 129 at 29-30). For reasons stated in Section VI, *supra*, the provision of ASL interpreters would benefit Plaintiffs and all deaf users of ASL in Florida, as providing that auxiliary aid would allow for equally effective communication.

Further, Plaintiffs have articulated specific standards for relief, as fully explained in Section VII, *supra*. This Court has acknowledged that in the First Amended Complaint, Plaintiffs provided a standard from which injunctive relief could be drawn, as also explained above.

## CONCLUSION

For all of the foregoing reasons, and any other reasons the Court deems appropriate and just, Plaintiffs respectfully request that the Court deny the Motion.

Dated: November 8, 2022                    Respectfully submitted,

/s/ Ian S. Hoffman_____
Ian S. Hoffman (*pro hac vice*)
Julia H. Wingfield (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP (DC)
601 Massachusetts NW
Washington, DC 20001
Tel: 202-942-6406
ian.hoffman@arnoldporter.com
julia.wingfield@arnoldporter.com

Zachary A. Sweebe (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP (NY)
250 West 55th Street
New York, NY 10019

43

Tel: 212-836-8000
zachary.sweebe@arnoldporter.com

*/s/ Ann Marie Cintron-Siegel*
Ann Marie Cintron-Siegel (FL Bar No. 0166431)
DISABILITY RIGHTS FLORIDA
1930 Harrison Street, Ste 104
Hollywood, FL 33020
850-488-9071 Ext. 9790

Lauren Brittany Eversole (FL Bar No. 120245)
DISABILITY RIGHTS FLORIDA
2473 Care Drive, Suite 200
Tallahassee, FL 32308
850-488-9071 Ext. 9702

*/s/ Leah Wiederhorn*
Leah Wiederhorn (*pro hac vice*)
Marc Charmatz
NATIONAL ASSOCIATION OF THE DEAF
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
301-587-1788

*Attorneys for Plaintiffs*

44

172780478

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

The undersigned hereby certifies that this motion and incorporated memorandum of law contains 9,995 words, excluding the case style, table of contents, table of authorities, signature block, certificate of compliance with local rule 7.1(F), and certificate of service. The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

/s/  Ian S. Hoffman
Ian S. Hoffman

172780478

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on November 8, 2022, a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will serve a copy via email to all Defendants' counsel on record.

/s/  Ian S. Hoffman
Ian S. Hoffman

172780478