**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

MICHAEL YELAPI; PATRICIA SANCHEZ; JAIME MARIONA; JULIA MICHALKA; CARLOS APONTE; and DISABILITY RIGHTS FLORIDA,
*Plaintiffs*,

v.

RONALD DESANTIS, in his official capacity as Governor of Florida; THE EXECUTIVE OFFICE OF THE GOVERNOR; FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, the public body corporate acting for and behalf of Florida State University; and JOHN THRASHER, in his official capacity as President of Florida State University,
*Defendants*.

Case No. 4:20-cv-00351-AW-MAF

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**
**(IN RESPONSE TO THE EOG DEFENDANTS' OPPOSITION)**

# TABLE OF CONTENTS

Page


ARGUMENT .......... 1

I. Plaintiffs Have Standing .......... 1

A. *The EOG's Failure to Provide ASL Interpretation at the Governor's Press Briefing Injures Plaintiffs* .......... 1

B. *Plaintiff Aponte's Injuries are Traceable to and Redressable by the EOG* .......... 3

C. *Plaintiff DRF Has Associational Standing* .......... 4

II. The EOG Defendants' Failure to Provide ASL Interpreters at the Governor's Press Briefings Unlawfully Discriminates Against Plaintiffs .......... 5

A. *The EOG Defendants are Covered Entities Under the ADA and RA* .......... 5

B. *The Governor's Press Briefings Are A Service, Program, or Activity of the EOG* .......... 6

C. *Title II Does Not Require Each Plaintiff to Request ASL Interpreters Before Filing Suit* .......... 9

III. The EOG Does Not Provide Equally Effective Access to Plaintiffs at the Governor's Press Briefings .......... 11

IV. The EOG Has Not Presented Sufficient Evidence to Establish Undue Burden or Fundamental Alteration .......... 13

A. *No Material Dispute of Fact on Undue Burden* .......... 14

B. *No Material Dispute of Fact on Fundamental Alteration* .......... 16

CONCLUSION .......... 17

REQUEST FOR ORAL ARGUMENT .......... 17

In their opposition, the EOG Defendants assert a hodgepodge of arguments, none of which is sufficient to demonstrate a genuine dispute of material fact or rebut Plaintiffs' entitlement to judgment as a matter of law. Accordingly, the Court should grant Plaintiffs' motion for summary judgment.

## ARGUMENT

### I. Plaintiffs Have Standing

#### A. *The EOG's Failure to Provide ASL Interpretation at the Governor's Press Briefing Injures Plaintiffs*

At the motion to dismiss stage, this Court observed that Plaintiffs alleged that they "cannot understand the Governor's briefings," and held: "[t]his is enough to show an injury in fact." ECF 65 at 10. Now, after discovery, Plaintiffs have *proven*—through their own testimony, as well as unrebutted expert testimony—that they cannot understand the Governor's briefings without ASL interpretation. ECF 131 at 38-42; ECF 136 at 35-41; ECF 130-13. Again, this is enough to show injury-in-fact.

The EOG claims that because Plaintiffs have not identified "any information about COVID-19 or impending hurricanes they were deprived of" due to the absence of an ASL interpreter at the Governor's press briefings, they cannot show injury. ECF 132 at 10. But this Court already has rejected this argument, noting that in *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 836 (11th Cir. 2017), the Eleventh Circuit "'reject[ed] a requirement that a disabled [plaintiff] explain exactly what was

poorly communicated when that [plaintiff] could not know that information precisely because of the disability,' finding that it would be 'exceedingly difficult for a deaf [plaintiff] to recount a conversation he or she could not hear.'" ECF 65 at 10. The law simply does not require a deaf plaintiff to identify specific information that was poorly communicated to establish standing.

The EOG also argues that Plaintiffs "have not established that they routinely rely upon gubernatorial press briefings for information about COVID-19 or impending hurricanes." ECF 132 at 10. But Defendants cite no authority for any such "routinely rely" requirement under the standing inquiry. In all events, Plaintiffs cannot "routinely rely" on the Governor's press briefings for any information because Plaintiffs are deaf and the Governor does not provide ASL interpreters for all such briefings.

The EOG also argues that Plaintiffs "have not even identified any gubernatorial press briefings that they attempted to watch where an ASL interpreter was not provided." *Id.* But this is factually incorrect: Plaintiffs Sanchez and Mariona testified about their attempts to watch Governor DeSantis's press briefings without ASL interpretation, and the deep difficulties of doing so. *See* ECF 127-2 at 47:8-17-49:8; ECF 127-4 at 32:11-33:2; 102:14-4; 155:21-156:16. Further, Plaintiffs Yelapi and Mariona testified that if ASL interpreters were provided at the Governor's press briefings they would watch them. ECF 127-1 at 153:9-154:17;

ECF 127-4 at 187:8-188:5. Finally, Plaintiffs need not make futile attempts to watch each gubernatorial briefing without ASL interpreters in order to demonstrate an injury. For example, if a wheelchair-bound Floridian knows a state building has no wheelchair ramps allowing building access, that person need not travel to the building and attempt to climb the stairs to demonstrate an injury.

### B. *Plaintiff Aponte's Injuries are Traceable to and Redressable by the EOG*

Plaintiffs also have proven that their injury is fairly traceable to the EOG's failure to provide ASL interpretation, and that providing ASL interpretation would redress their injuries. ECF 131 at 18-19; ECF 136 at 11-12. Even "a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Resnick v. AvMed*, *Inc.*, 693 F.3d 1317 (11th Cir. 2012). A failure to provide equally effective communication is fairly traceable to defendants when the defendants' "conduct [] does not allow for effective communication." *Cobb v. Georgia Dep't of Community Supervision*, No. 1:19-cv-03285, ECF No. 262, at 17 (N.D. Ga. Oct. 13, 2022).

Here, the EOG argues that "the crux of Mr. Aponte's grievances is that the television broadcasters he watches do not adequately include the Governor's ASL interpreters in the frame." ECF 132 at 10. This is wrong on multiple levels.

First, the Governor has not provided ASL interpretation at any press briefing related to COVID-19 *for over two years*—that is, since August of 2020. *See* ECF

130-19; ECF 130-20; ECF 130-21. Moreover, until very recently (September 2022), the Governor also failed to consistently provide ASL interpretation at press briefings related to hurricanes. *Id*. Indeed, by their own count, the EOG provided ASL interpretation at approximately 37 out of 246 press briefings from February 27, 2020 to March 29, 2022—approximately 15% of such briefings. ECF 130-19; 130-20. Accordingly, while Mr. Aponte testified that certain television networks did not include the ASL interpreter in the frame, that testimony pertained only to the handful of press briefings, conducted in 2020, in which the Governor *did* provide ASL interpreters. It has nothing to do with the Governor's *present* failure to provide ASL interpreters at all press briefings related to COVID-19 or hurricanes.

Second, the EOG does its *own* broadcasts of all of the Governor's press briefings, streaming them on various social media platforms, and the EOG would include ASL interpreters within the frame of those broadcasts if and when the EOG actual provides ASL interpreters for the briefings. ECF 135 at 10. Accordingly, Plaintiffs' injury is plainly redressable by the EOG through its own broadcasts (as well as the FSU Defendants' broadcasts), regardless of whether other TV networks include the ASL interpreters in frame.

### C. *Plaintiff DRF Has Associational Standing*

This Court already "conclude[d] that DRF has associational standing because its members have standing and this case is germane to DRF's purpose." ECF 65 at

8, n. 4. Further, as discussed above, Plaintiffs have standing, and thus DRF has associational standing. DRF also has associational standing because the unrebutted expert evidence shows that there are numerous deaf Floridians—beyond just Plaintiffs—for whom closed captioning is insufficient to understand the Governor's press briefings, and thus who are injured by the EOG's failure to provide ASL interpretation. *See* ECF 130-11. Indeed, fluency in English is "often more challenging than deaf individuals because of lack of access to spoken English around them." ECF 130-13 at 20. Due to this lack of access, and because written English text lacks message equivalence, fifty percent of the deaf population reads English at a fourth grade level or below. *Id.* at 24.

## II. The EOG Defendants' Failure to Provide ASL Interpreters at the Governor's Press Briefings Unlawfully Discriminates Against Plaintiffs

### A. *The EOG Defendants are Covered Entities Under the ADA and RA*

Defendants do not dispute they are covered entities under the ADA. *See* ECF 129; ECF 132. There is also no serious dispute that the ADA and RA "have the same substantive requirements." ECF 132 at 11-12; ECF 65 at 6 n. 3. As such, whether the RA *also* applies to Defendants is largely academic. Nevertheless, the EOG Defendants are recipients of federal financial assistance, and thus are covered by the RA.

The Division of Emergency Management (DEM) is a division "established *within* the Executive Office of the Governor," and its director "shall be appointed by

and serve at the pleasure of the Governor and shall be the head of the division for all purposes." Fla. Stat. § 14.2016(1) (emphasis added); *see* ECF 130-24 (EOG org chart); ECF 127-14 at 60 (describing DEM and EOG as "part of the same unit"). DEM itself receives federal funds. ECF 136 at 8; ECF 130-22. Contrary to the EOG's argument, this is sufficient to show the EOG receives federal financial assistance. ECF 65 at 12. In *McMullen*, "discovery revealed that the department in fact received no federal funds, so the county's immunity remained intact." *Id.* (citing *McMullen v. Wakulla Cty. Bd. of Cty. Comm'rs*, 650 F. App'x 703, 706-09 (11th Cir. 2016). Here, unlike the department at issue in *McMullen,* DEM does receive federal funds, and therefore the EOG has no reasonable basis to argue it is not a covered entity under the RA.[1]

### B. *The Governor's Press Briefings Are A Service, Program, or Activity of the EOG*

As explained in Plaintiffs' motion, the ADA and RA apply broadly to all services, programs, and activities of a public entity, which amounts to "anything a public entity does" and "all of the operations of" the public entity. *See* ECF 131 at 31-33. Nevertheless, the EOG argues that the Governor's press briefings are not services, programs, or activities of the EOG. *See* ECF 132 at 13-15. Rather, the

---

[1] *Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1336 (11th Cir. 2005), is also factually and legally distinct, as discussed in Plaintiffs' prior motion. ECF 136 at 46.

EOG argues, "the relevant public service is the information presented at the press briefings." *Id*. at 13.

As an initial matter, it is unclear why focusing on "the information presented" would mean the Governor's press briefings are *not* a service, program, or activity of the EOG. In all events, this amounts to a distinction without a difference. Even if the information presented at the press briefing is the relevant service, the Governor is still obligated under the law to make his communication of that information equally effective and accessible to Plaintiffs. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130; 28 C.F.R., Ch. 1, Pt. 35, app. B. The EOG must provide ASL interpreters to communicate the content of the Governor's COVID-19 and hurricane press briefings to deaf Floridians, which will allow them to receive the information at the same time, and in the same, detail, scope, and frequency, as his communications to all other Floridians.

The EOG cites the Eighth Circuit's decision in *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010) to argue the relevant service is not the press briefings, but only the information presented at such briefings. ECF 132 at 13. But not only is *Loye* "factually distinct" as this Court already has recognized (ECF 30 at 20), *Loye* supports Plaintiffs' claims. There, the public entity maintained that it had provided ASL interpreters for *all* public meetings about a decontamination effort, but one deaf plaintiff maintained that the public entity had missed two meetings. However, there

was no dispute that the public entity had "arranged an ASL-interpreted private meeting afterward for deaf evacuees, to assure everyone had an opportunity to ask questions." *Loye v. Cnty. of Dakota*, 647 F. Supp. 2d 1081, 1091 (D. Minn. 2009). It was in this context the court noted the distinction between "providing information" after the fact and providing it during the initial meetings. *See Loye*, 625 F.3d at 499. Here, by contrast, the EOG Defendants have never made the information provided at the press briefings available to Plaintiffs via ASL interpretation—either at the press briefings or after the fact.

Finally, the EOG asserts a variety of ill-defined consequences should the Court recognize that the Governor's press briefings are one of its "services." ECF 132 at 14-15. But this argument ignores the limiting factors already built into the ADA and the RA that allowing public entities to demonstrate an undue burden or fundamental alteration in each context and with regard to each requested accommodation. *See* 28 C.F.R. § 35.160(a)(1); 28 C.F.R. § 35.130(b)(1)(ii)-(iii); 28 C.F.R. § 41.51(b)(1)(ii)-(iii); 28 C.F.R. § 35.150(a)(3); 28 C.F.R. § 35.164. Holding the Governor's press briefings are one type of "service, program, or activity" of the EOG would not have any of the calamitous consequences the EOG suggests.

### C. *Title II Does Not Require Each Plaintiff to Request ASL Interpreters Before Filing Suit*

The EOG Defendants argue they are entitled to summary judgment because all Plaintiffs did not make a specific demand for ASL interpreters before filing suit. ECF 132 at 15-17. This argument also fails.

First, the EOG Defendants admit that two Plaintiffs *did* make specific requests for ASL interpreters at the Governor's press briefings before this suit was filed. Plaintiff Mariona made several such requests (ECF 136 at 10), as did DRF on behalf of *all* deaf Floridians. ECF 132 at 16. Defendants do not explain how requiring each of the other Plaintiffs to make the same request would be legally required or would make any difference.

Second, to the extent a "specific demand" requirement could ever apply, it performs at most "a signaling function—*i.e.,* it alerts the public entity to the disabled person's need for an accommodation—and where, as here, the inmate's disability is obvious and indisputably known to the provider of services, no request is necessary."[2] *Pierce v. D.C.*, 128 F. Supp. 3d 250, 270 (D.D.C. 2015) (Brown

---

[2] It is unclear whether any "specific demand" requirement applies where, as here, the ADA or RA plaintiff seeks only forward-looking injunctive relief based on ongoing discrimination. For example, in *Rylee v. Chapman*—cited by Defendants—the ADA/RA plaintiff asserted money damages claims based on alleged failures to provide him interpreters during his "arrest, booking, interrogation, and first appearance hearing." 316 F. App'x 901, 902 (11th Cir. 2009). But the plaintiff in *Rylee* had failed to request an interpreter at each stage, told the officers he could read

Jackson, J.); *see also id.* at 269-270 (rejecting similar demand argument as "truly baffling as a matter of law and logic" and observing that the ADA and RA should not "be construed to be unavailable to such [deaf] persons unless they somehow manage to overcome their communications-related disability sufficiently enough to convey their need for accommodations effectively."); *see also Brown v. Cty. of Nassau*, 736 F. Supp. 2d 602, 618-19 (E.D.N.Y. 2010) ("[A] request for an accommodation is not required where the disabled individual's need for an accommodation is obvious."). Here, Plaintiffs' deafness is undisputed and well known to Defendants, as is their demand for ASL interpreters. Accordingly, the lack of a specific pre-suit demand from each and every Plaintiff is irrelevant.

Third, Defendants never explain how a pre-suit demand from every Plaintiff would have made any difference. EOG argues the alleged lack of pre-suit demands left them "[w]ithout information about specific deaf individuals and their specific circumstances," precluding the EOG from "determin[ing] whether DRF's requested accommodation was necessary or reasonable." ECF 132 at 16. But this litigation has been pending for over two years, and Defendants have deposed each plaintiff and received multiple expert reports and assessments pertaining to these Plaintiffs

---

lips and read and write, and said he did not need an interpreter at his first appearance hearing. *Id.* at 906. It is thus unsurprising the court focused on the plaintiff's contemporaneous lack of demand for ASL interpreters in granting summary judgment for the defendants, who otherwise were not notified of his asserted needs.

and their particular linguistic abilities and needs for ASL interpreters. Defendants have an abundance of information about Plaintiffs, yet Defendants *still* refuse to provide them with ASL interpretation. The evidence thus demonstrates that more pre-suit demands would have been futile.

## III. The EOG Does Not Provide Equally Effective Access to Plaintiffs at the Governor's Press Briefings

The EOG does not dispute that it is legally required to "take appropriate steps to ensure that communications with…members of the public…with disabilities are *as effective as* communications with others." ECF 132 at 8 (quoting 28 C.F.R. § 35.160(a)(1)) (emphasis added). The EOG also admits that communications to deaf persons must be "equally effective" as those to hearing persons. *See id*. Yet, the EOG argues that it already has provided meaningful access to the governor's press briefings regarding COVID-19 and hurricanes without using ASL interpreters. *Id*. at 17-20. That is incorrect.

First, the EOG argues that Plaintiffs Yelapi, Sanchez, Michalka, and Mariona already have meaningful access to press briefings through various written means, including closed captioning, summaries of press briefings, and social media posts. ECF 132 at 18. But Plaintiffs only moved for partial summary judgment for these Plaintiffs, based upon the recognition that there may be fact disputes concerning

their abilities to access the Governor's press briefings without ASL interpretation. As such, the EOG's argument regarding these Plaintiffs is a red herring.[3]

Second, for Plaintiff Aponte, the EOG Defendants point out that they have sometimes provided ASL interpreters for certain press briefings and that Mr. Aponte has benefitted from seeing some of them. ECF 132 at 18-19. The EOG thus argues that Mr. Aponte "was provided meaningful access to information about COVID-19 and hurricanes." *Id*. at 19. This argument strains credulity, and the fact that Mr. Aponte benefitted from the EOG's prior, sporadic utilization of ASL interpreters supports awarding summary judgment in Plaintiff Aponte's favor.

The EOG has not provided ASL interpretation at any press briefing related to COVID-19 for *over two years*—since August of 2020—and prior to that, the provision of interpreters was sporadic at best. ECF 130-19; ECF 130-20. As stated above, the EOG's own figures on subject press briefings showed only a 15% compliance rate. And for the recent press briefings related to Hurricane Ian, the EOG still failed to provide ASL interpretation at 33% of those briefings. ECF 130-21. Moreover, the EOG never explains how previously providing ASL interpretation

---

[3] To be sure, these Plaintiffs have requested ASL interpreters and Defendants cannot establish that providing closed captions alone is "equally effective" for them as providing ASL interpretation. *See* ECF 136 at 9-11. And Plaintiffs have presented unrebutted expert testimony explaining exactly why this is the case for these and many other deaf individuals. ECF 130-13. At a minimum, then, Defendants' motions for summary judgment with respect to these individuals must be denied.

at *some* press briefings related to COVID-19 satisfies its ongoing obligations under the RA and ADA when it has indisputably *stopped* providing interpreters for such briefings. Each time the EOG fails to provide an ASL interpreter at the Governor's press briefings related to COVID-19 and hurricanes, Mr. Aponte is denied the opportunity to benefit from that service, which the EOG is prohibited from doing under the law. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a); *see also McCullum,* 768 F.3d at 1147 n. 8 (denial of the equal *opportunity* to benefit from a communication "is enough to establish a violation of both the RA and ADA.") (emphasis added); *see also Liese,* 701 F.3d at 343.

## IV. The EOG Has Not Presented Sufficient Evidence to Establish Undue Burden or Fundamental Alteration

The EOG Defendants argue that providing ASL interpreters would impose an undue burden and/or fundamental alteration. ECF 132 at 20-23. But the EOG has failed to comply with the express procedural arguments under the law—namely, a "written statement of the reasons for reaching that conclusion," authored by the head of the public entity. 28 CFR § 35.164. The EOG has provided no such written statement, and thus should be precluded from making such arguments now. But even if the EOG was not precluded from making these arguments, there is no material dispute of fact that providing ASL interpreters at the Governor's press briefings would *not* constitute either an undue burden or a fundamental alteration.

**A. *No Material Dispute of Fact on Undue Burden***

The EOG mentions in passing the "basic financial cost" of hiring ASL interpreters, and suggests that those costs could cause an undue burden. ECF 132 at 20. But the financial impact here—approximately $70 per hour for ASL interpretation (ECF 127-12 at 36)—is negligible, and financial burdens cannot constitute an undue burden in all events. ECF 132 at 20-21; ECF 136 at 43.

The EOG also refers generically to "administrative burdens" of providing ASL interpreters at press briefings. ECF 132 at 21. But these purported "burdens" are belied by the fact that the EOG Defendants have recently (a) signed contracts with ASL interpreter vendors, (b) instituted a new policy to provide ASL interpreters for press briefings regarding impending hurricanes and other declared states of emergency, and (c) actually provided interpreters for some such hurricane briefings. ECF 136 at 6-7; ECF 127. If the EOG can overcome the purported "administrative burdens" each time there is an impending hurricane, it can overcome them when other subject press briefings arise, including those pertaining to COVID-19.

For example, the EOG Director of Communications' testimony regarding the feasibility of ASL interpreters was limited to experiences with another agency—not the EOG—and she admitted she did not research the EOG's ability to provide ASL interpreters. ECF 127-14 at 108:12-19. The EOG's Director of External Affairs also agreed that she had no "personal experience with…any difficulties lining up

ASL interpreters," as she "just heard from other people that it can be difficult." ECF 127-15 at 46:25-47:11; 64:8-65:16. Other cited testimony pertains to pre-vendor contract efforts to secure ASL interpreters, and indeed, one EOG official agreed that she "could quickly get an interpreter" to press briefings when interpreters in the area were on standby—the precise arrangement now secured by the regional vendor contracts. ECF 127-17 at 42:8-43:11.

The EOG also asserts that providing ASL interpreters at the Governor's press briefings is unduly burdensome "in light of the auxiliary aids and methods of disseminating information already provided." ECF 132 at 21. But the EOG continues to confuse the issue by directing the Court to consider "other sources" where Plaintiffs may be able to access the information the Governor provides during his press briefings. The Eleventh Circuit, and this Court, have rejected this very argument the EOG Defendants continue to advance. *Silva*, 856 F.3d at 835; ECF 65 at 10. The existence of other sources of information is irrelevant to an undue burden analysis—the law requires the EOG to make the press briefings accessible.

Moreover, as discussed at length in Plaintiffs' prior motion and in Section II, *supra*, the EOG's one auxiliary aid at those press briefings—closed captioning—is not equally effective as ASL interpreters in providing access to the Governor's press briefings. Plaintiff Aponte and many deaf Floridians like him does not have the ability to effectively access written English in closed captioning. *See* ECF 131 at

38-43; ECF 136 at 39-41. Instead, Plaintiffs need ASL interpreters to gain such meaningful access.

**B.** ***No Material Dispute of Fact on Fundamental Alteration***

Finally, the EOG argues that "*the injunction* requested by Plaintiffs would fundamentally alter the EOG Defendants' dissemination of emergency-related information because it would compromise the essential nature of the program." ECF 132 at 22 (emphasis added). But the EOG Defendants focus on the wrong question. The key question is whether the requested accommodation itself—not an injunction would fundamentally alter the program or service being provided. Here, the requested ASL interpreters plainly would not do so. As discussed in Plaintiffs' motion, inclusion of an ASL interpreter would at most amplify the Governor's message, making it accessible to *more* Floridians. ECF 131 at 38-39.

Moreover, the EOG's argument about the potential impact of an injunction is highly speculative and unsupported by the record. The EOG Defendants seem to suggest that an injunction directing the EOG Defendants to provide ASL interpreters at all press briefings regarding COVID-19 and hurricanes could lead to the EOG Defendants delaying the dissemination of "time-sensitive, possibly life saving information." ECF 132 at 22. But not only is there no record evidence supporting this speculation, the undisputed record evidence also demonstrates that the EOG Defendants *can* provide remote interpretation via picture-in-picture technology,

allowing ASL interpreters to be utilized from any location to provide the interpretation. ECF 130-14. This further cuts down on the risk that an ASL interpreter may not be present for an urgent press briefing.

Finally, this Court would retain jurisdiction over any injunction entered in Plaintiffs' favor, and thus would have the flexibility to assess the circumstances surrounding any failure to provide ASL interpreters for urgent, time-sensitive press briefings. The is not a reason to enter no injunction at all.

## CONCLUSION

Plaintiffs respectfully request the Court grant Plaintiffs' motion for summary judgment.

## REQUEST FOR ORAL ARGUMENT

Pursuant to N.D. Fla. Loc. R. 7.1(K), Plaintiffs respectfully request the Court to allow oral argument on Plaintiffs' motion for summary judgment, as well as the motions for summary judgment filed by the EOG Defendants and the FSU Defendants. Plaintiffs anticipate oral argument will take approximately two hours.

Dated: November 22, 2022

Respectfully submitted,

*/s/ Ian S. Hoffman*
Ian S. Hoffman (*pro hac vice*)
Zachary A. Sweebe (*pro hac vice*)
Julia H. Wingfield (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP (DC)
601 Massachusetts NW
Washington, DC 20001
Tel: 202-942-6406
ian.hoffman@arnoldporter.com
zachary.sweebe@arnoldporter.com
julia.wingfield@arnoldporter.com

*/s/ Ann Marie Cintron-Siegel*
Ann Marie Cintron-Siegel (FL Bar No. 0166431)
DISABILITY RIGHTS FLORIDA
1930 Harrison Street, Ste 104
Hollywood, FL 33020
850-488-9071 Ext. 9790

Lauren Brittany Eversole (FL Bar No. 120245)
DISABILITY RIGHTS FLORIDA
2473 Care Drive, Suite 200
Tallahassee, FL 32308
850-488-9071 Ext. 9702

*/s/ Leah Wiederhorn*
Leah Wiederhorn (*pro hac vice*)
Marc Charmatz
NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
301-587-1788

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

The undersigned hereby certifies that this motion and incorporated memorandum of law contains 3997 words, excluding the case style, table of contents, table of authorities, signature block, certificate of compliance with local rule 7.1(F), and certificate of service. The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

/s/ Ian S. Hoffman
Ian S. Hoffman

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on November 22, 2022, a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will serve a copy via email to all Defendants' counsel on record.

/s/ Ian S. Hoffman
Ian S. Hoffman